William **MAHONEY**, et al.,
Plaintiffs, Appellants,

v.

**BOARD OF TRUSTEES**, Boston Shipping Association–International Longshoremen's Association, AFL–CIO Pension Plan, Defendants, Appellees.

No. 91–2202.

United States Court of Appeals,
First Circuit.

Heard May 5, 1992.

Decided Aug. 18, 1992.

Paul A. Manoff, Boston, Mass., for plaintiffs, appellants.

Henry C. Dinger with whom Daniel P. Condon, Donna Stoehr Hanlon and Goodwin, Procter & Hoar, Boston, Mass., were on brief, for defendants, appellees.

Before BREYER, Chief Judge, CYR, Circuit Judge, and BOYLE,* District Judge.

BREYER, Chief Judge.

Between 1986 and 1990 the trustees of the Boston longshoremen's pension plan significantly increased the size of retirement pensions. In doing so, they divided the increases unevenly, treating longshoremen who had already retired less favorably than those who were still working. Members of the former group claim that the trustees thereby violated the fiduciary duty they owe to already-retired longshoremen. *See* 29 U.S.C. §§ 1001–1461 (Employee Retirement Income Security Act ("ERISA")). The district court granted summary judgment for the trustees. We affirm.

## I

### *Facts*

The record, read appropriately in appellants' favor, Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250–52, 255, 106 S.Ct. 2505, 2510, 2511–12, 2513–14, 91 L.Ed.2d 202 (1986); *Rodriques*

* Of the District of Rhode Island, sitting by desig-

*v. Furtado*, 950 F.2d 805, 809 (1st Cir. 1991), indicates the following:

1. The longshoremen's pension plan has fourteen trustees. Working members of the longshoremen's union elect seven; representatives of Port of Boston shipping companies, which employ longshoremen, select the other seven.

2. From 1976 (when the pension plan was reorganized as an ERISA plan) through 1983, the pension plan was "underfunded." That is to say, the plan did not have sufficient assets to pay for the benefits it already owed or had promised. The shipping companies increased the level of contributions. Also, the value of the plan's investments began to rise much more rapidly than predicted.

3. After 1983, the plan became "overfunded." That is to say, the plan had significantly more assets than it needed to pay for the benefits it then owed or had promised. The plan's actuary concluded that the plan risked tax penalties applicable to pension plans with excess contributions. *See* 26 U.S.C. §§ 401–417.

4. The trustees then began to raise benefits. They did so in a series of changes approved in March 1987, April 1988, April 1989, and March 1990.

5. The changes increased both (a) existing pensions paid to longshoremen already retired, and (b) future pensions promised to longshoremen still at work. The increases paid to members of the former group were much smaller than those promised to members of the latter group. Take, for example, the pension paid a longshoreman retiring after thirty years of service. The changes meant that the monthly pension of such a longshoreman who retired before 1986 went from $750 to $800, then to $825, then to $835, and then to $875. The monthly pension promised to such a longshoreman who was still at work in 1990 went from $750 to $1050, then to $1200, then to $1320, then to $1575. Moreover, the monthly pension paid to already-retired longshoremen had a "cap" of $875 (even

nation.

for those who retired after more than thirty years of work). But, the monthly pension promised to longshoremen still at work had a "cap" of $2100 (the amount paid to those retiring after forty or more years of work). (*See* Appendix.)

6. The changes "solved" the overfunding problem. From 1986 to 1989, the value of the plan's assets had risen by $12 million more than the plan's actuary had originally projected. The pension changes that the trustees voted used $8 million of this $12 million to pay for increased benefits for the approximately 600 already-retired longshoremen. The remaining $4 million would help pay for the increased benefits promised to the approximately 350 to 500 longshoremen still at work.

7. The record reveals that, when asked why the trustees gave smaller increases to longshoremen who had already retired:

—three trustees said they did not remember any discussion of the matter or know why the trustees voted as they did;

—one trustee said they had simply followed recommendations of the union and the plan's actuary;

—the plan's actuary said that trustees, in fixing pensions for working longshoremen, looked to pensions paid at other competitive ports;

—the plan's administrator (present at the trustees' meetings) said that the trustees set working longshoremen's pensions with an eye toward pensions being paid elsewhere, and that the trustees had not discussed why they voted lesser increases to already-retired longshoremen; and

—one trustee said that he believed they need give no increases to those who had already retired as they were already receiving everything they had been promised when they retired.

As we have said, a group of longshoremen who retired before the trustees voted the changes challenged the allocation of benefits that the trustees chose, an allocation that gave them smaller pension increases than it promised to longshoremen who were still at work. As we have also said, the district court rejected this challenge and granted summary judgment in the trustees' favor.

## II

### *The Law*

#### A

##### *The Legal Standard*

The appellants concede that ordinarily a court, in deciding whether trustees have violated the common law-based fiduciary obligations that ERISA imposes, 29 U.S.C. § 1104, will simply ask whether their decisions are "arbitrary and capricious in light of the trustees' responsibilities to all potential beneficiaries." *Cleary v. Graphic Communications Int'l Union Supplemental Retirement and Disability Fund,* 841 F.2d 444, 449 (1st Cir.1988); *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 110, 109 S.Ct. 948, 954, 103 L.Ed.2d 80 (1989) (standards from common law of trusts "'applicable to [ERISA] fiduciaries'") (citation omitted); *see also Palino v. Casey,* 664 F.2d 854, 858 (1st Cir.1981). They point out that here, however, seven of the plan's trustees (those selected by the union) were themselves working longshoremen, not retired longshoremen. These seven trustees therefore benefitted personally from a decision that gave larger increases to the former group. And, for that reason, the appellants argue, we should apply an especially strict standard of review. They point to several cases which, they say, support their claim. *See Pilon v. Retirement Plan for Salaried Employees of Great N. Nekoosa Corp.,* 861 F.2d 217, 219 (9th Cir. 1988); *Deak v. Masters, Mates and Pilots Pension Plan,* 821 F.2d 572, 578–80 (11th Cir.1987), *cert. denied,* 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988); *Struble v. New Jersey Brewery Employees' Welfare Trust Fund,* 732 F.2d 325, 333 (3d Cir. 1984); *Donovan v. Bierwirth,* 538 F.Supp. 463, 470 (E.D.N.Y.1981); *Winpisinger v. Aurora Corp. of Illinois, Precision Castings Div.,* 456 F.Supp. 559, 562 (N.D.Ohio 1978).

We conclude, however, that no special, strict standard of review is appropriate in this case, for several reasons. First, we have examined the ordinary law of trusts—law that guides, but does not control, our decision. *See Firestone Tire & Rubber Co.*, 489 U.S. at 110, 109 S.Ct. at 954 ("legislative history confirms" that " 'certain principles developed in the evolution of the law of trusts' " apply to ERISA fiduciaries) (citation omitted); *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56, 107 S.Ct. 1549, 1557–58, 95 L.Ed.2d 39 (1987) (Congress intended development of a "federal common law of rights and obligations under ERISA-regulated plans"). We have found that, under the common law of trusts, trustees may be included among the beneficiaries of a trust. Restatement (Second) of Trusts §§ 99, 115 (1959); *see also* William F. Fratcher, 2 Scott on Trusts §§ 99.2, 115 (4th ed. 1988). Such trustees, like trustees generally, have the power to do acts that are "necessary or appropriate to carry out the purposes of the trust and are not forbidden by the terms of the trust." Restatement (Second) of Trusts § 186. Moreover, "[w]here discretion is conferred upon the trustee with respect to the exercise of a power," including the "power[ ] to allocate the beneficial interest among various beneficiaries," ordinarily the trustee's "exercise is not subject to control by the court, except to prevent an abuse by the trustee of his discretion." *Id.* § 187 & cmt. c; *see also id.* § 183 cmt. a ("By the terms of the trust the trustee may have discretion to favor one beneficiary over another."); 3A Scott on Trusts § 232 (trustee's "duty of impartiality ... ordinarily" gives him "considerable discretion" in deciding the "balance" between *successive* beneficiaries).

We have also found four state court cases that consider specifically whether the ordinary, trust law standard of review applies where (as here) the trustee exercises his discretionary powers to favor a group of beneficiaries of which he is a member. Two of these cases say that *the ordinary standard does apply*. *Deal v. Huddleston*, 288 Ark. 96, 702 S.W.2d 404, 405–06 (1986) (where settlor "meant to have bene-

fit of the [two trustee-beneficiaries'] best judgment," court reviews distribution of assets among the four beneficiaries only to ensure distribution was not "arbitrary" but was " 'appropriate, fair, just, and equitable' "); *Bracken v. Block*, 204 Ill. App.3d 23, 149 Ill.Dec. 577, 578–79, 561 N.E.2d 1273, 1274–75 (1990) (trustee-"primary beneficiary," with "broad powers ... to do all ... acts as she judged necessary or desirable to carry out the purposes of the trust," engaged in "proper exercise of her discretion as trustee" when she sold trust's "only asset remaining" to provide for her support); *see also Maytag v. United States*, 493 F.2d 995, 999 (10th Cir.1974).

The other two cases applied a stricter-than ordinary standard. *First Union Nat'l Bank of South Carolina v. Cisa*, 293 S.C. 456, 361 S.E.2d 615, 618 (1987); *Armington v. Meyer*, 103 R.I. 211, 236 A.2d 450, 456–57 (1967). But, these cases involved situations in which the risk of bias or abuse was particularly great. In one of them, the potentially favored group of beneficiaries included *only* the trustees themselves. *Armington*, 236 A.2d at 456; *but cf. Deal*, 702 S.W.2d at 405 (similar facts, but imposing only ordinary trust law review). In the other case, the settlor's apparent grant of authority to the trustee-beneficiary (to participate in discretionary decisions to distribute funds to herself) was, in the court's view, ambiguous. *First Union Nat'l Bank*, 361 S.E.2d at 619.

We conclude that the common law of trusts supports the application of the ordinary, "arbitrary and capricious" standard where, as here, the trustees exercised clearly granted discretion to benefit one group of beneficiaries more than another, and the trustees benefited from that action as members of the much larger, favored group.

Second, this case involves a pension plan that is subject to the Labor–Management Relations Act ("LMRA"), 29 U.S.C. § 186, as well as to ERISA. And, that fact gives rise to special considerations that argue in favor of applying the ordinary, "arbitrary and capricious" standard. The LMRA requires that "employees and employers are

equally represented in the administration" of pension plans receiving employer contributions. *Id.* § 186(c)(5)(B); *cf. id.* § 1108(c)(3) (ERISA provision permitting employee benefit plans to include union representatives as trustees). Labor representatives may themselves be active, working union members. Where they are, they often will have personal interests similar to some, but not all, of a plan's beneficiaries. To apply a special, strict standard of review in all such circumstances could tip the balance of decision-making power, on joint employer-union administered boards, in favor of the employers (whose representatives could more often propose and support pension formulas and funding levels without being subjected to close judicial scrutiny). It could discourage certain benefit plans from including union members on their boards of trustees. It would risk having courts substitute their judgments for those of the trustees on many questions best left to trustees' discretion and expertise. *See Firestone Tire & Rubber Co.,* 489 U.S. at 111, 109 S.Ct. at 954; *Elser v. I.A.M. Nat'l Pension Fund,* 684 F.2d 648, 654 (9th Cir.1982), *cert. denied,* 464 U.S. 813, 104 S.Ct. 67, 78 L.Ed.2d 82 (1983). And it could embroil courts in intra-union conflicts better left for resolution by the employees' own representatives. *Cf. NLRB v. Indus. Union of Marine & Shipbuilding Workers,* 391 U.S. 418, 424, 88 S.Ct. 1717, 1721–22, 20 L.Ed.2d 706 (1968).

Third, we disagree with the appellants about the meaning of ERISA (and LMRA) case law. The Ninth Circuit, when reviewing a nearly identical claim of discrimination between present and future pension beneficiaries, applied the "arbitrary and capricious" standard, and not a stricter standard, of review. *Toensing v. Brown,* 528 F.2d 69, 72 (9th Cir.1975) (applying LMRA); *Firestone Tire & Rubber Co.,* 489 U.S. at 109–11, 109 S.Ct. at 953–54 (same standard for review of trustees' discretionary actions under ERISA as for review of trustees' actions under LMRA); *cf. NLRB v. Amax Coal Co.,* 453 U.S. 322, 331–32, 101 S.Ct. 2789, 2795–96, 69 L.Ed.2d 672 (1981).

The cases that appellants cite for a "stricter standard" do not involve the kind of conflict at issue here. Rather, they concern conflicts not *among* the interests of different beneficiaries, but conflicts *between* (a) the interests of beneficiaries *and* (b) the interests of a *non*-beneficiary. They involve, in the language of ordinary trust law, claimed breaches of the duty of *loyalty to* beneficiaries, not the duty of *impartiality among* beneficiaries. *Compare* Restatement (Second) of Trusts § 170(1) (trustees must act "solely in the interests of the beneficiary") *and* 29 U.S.C. § 1104(a) (nearly identical language in ERISA provision) *with* Restatement (Second) of Trusts § 183. In *Struble,* 732 F.2d 325, for example, the court said that an especially strict standard of review would apply where employer trustees (deadlocked with union trustees but upheld by an umpire) returned a pension fund surplus to the contributing employers. The court specified that an ordinary, "arbitrary and capricious" standard of review would have applied if the conflict had been *among* beneficiaries' interests. The claim before the court, however, was

> not that the trustees have incorrectly balanced valid interests [of "present claimants" and "future claimants"], but rather that they have sacrificed valid interests to advance the interests of non-beneficiaries [*i.e.,* the employers].

*Id.* at 333–34.

The court in *Pilon,* 861 F.2d 217, ultimately seems to have applied only an "arbitrary and capricious" standard of review to a trustee who interpreted plan language unfavorably to the company's star salesman. It also said that "closer examination" was warranted where the plan's sole trustee was also the salesman's employer, but it said so because

> the trustee of an employer-administered plan such as the one here serves two masters: as trustee, he is obliged to act in the best interests of plan beneficiaries, but as a businessperson, he must also tend to his profit margin.

*Id.* at 219, 218. To that extent, the *Pilon* court's endorsement of closer scrutiny also seems rooted in a conflict between benefi-

ciaries and non-beneficiaries (rather than *among* beneficiaries).

The court in *Deak*, 821 F.2d 572, did not apply a special, strict standard of review. To the contrary, it held that the "arbitrary and capricious" standard applied in reviewing a plan amendment that favored (a) retired persons who went back to work for employers that contributed to the plan over (b) retired persons who went back to work for non-contributing employers. It found the amendment arbitrary because the amendment's "purpose [was one] of bolstering the Union's stronghold on the supply of masters, mates and pilots," and not one which served the interests of beneficiaries. *Id.* at 578–79. The court added that, "until a situation arises which requires action in the interest of a party other than, and in conflict with the interests of, the plan beneficiaries," trustees need not act with the special "caution" required "in areas of [such] potential conflicts of interest." *Id.* at 580.

One of the two district court cases to which appellants refer also involves a conflict *between*, on the one hand, beneficiary interests *and*, on the other hand, the interests of non-beneficiaries (specifically, management interests) to which the trustees might have been particularly sensitive (as members of management). *Bierwirth*, 538 F.Supp. at 467, 470–71 ("dual loyalties" problem, requiring closer scrutiny, in decision by trustees, all officers of employer or its subsidiaries, to have pension plan purchase stock in employer company in support of management's efforts to defeat takeover attempt).

The other district court case involved a board, with equal numbers of union and employer trustees, which cancelled "past-service credits" held by non-union employees whose employers joined the plan. *Winpisinger*, 456 F.Supp. at 562. The district court did apply an especially strict standard of review. It is not clear, however, just why the court did so. It may have thought that the trustees' action served non-beneficiary interests (those of the union in encouraging union membership), *id.* at 569; or it may have thought the amendment

seemed too close to a violation of ERISA's prohibition on revoking vested pension benefits, *see id.* at 566, 569; or it may simply have misunderstood the relevant ERISA statute, *id.* at 567. Regardless, *Winpisinger* does not contain an analysis of these matters, and, whatever support it offers appellants, it conflicts with later, circuit court authority.

We conclude, for the reasons stated, that we must review the trustees' action before us under an "arbitrary and capricious" standard. *See generally Cleary*, 841 F.2d at 449–50; *Foltz v. U.S. News & World Report, Inc.*, 865 F.2d 364, 374 (D.C.Cir.), *cert. denied*, 490 U.S. 1108, 109 S.Ct. 3162, 104 L.Ed.2d 1024 (1989); *Stewart v. National Shopmen Pension Fund*, 795 F.2d 1079, 1083 (D.C.Cir.1986); *Morse v. Stanley*, 732 F.2d 1139, 1145 (2d Cir.1984).

### B

### *The Standard Applied*

■ We agree with the district court that the trustees' decision was not arbitrary or capricious. First, in the absence of some special circumstance, it does not seem arbitrary or capricious for trustees, to whom the trust agreement gives discretionary powers in setting pension benefit levels, to promise current workers much larger pension increases than those paid to workers who have already retired. Imagine a fully-funded pension plan with assets just sufficient to provide a pension, at Level $x$, for *all* employees, both those still working and those who have already retired. A decision by the trustees to double the pension, to Level $2x$, will require significantly increased contributions to pay for the increased pensions. Employees still working (or the employers who pay for the work of those employees) will make those contributions. Employees who have already retired will not make those contributions. In such circumstances, it seems fair for the trustees to decide to pay Level $2x$ only to those employees who are still working.

Real-world situations may not perfectly embody this example. But, in light of the example, it is not surprising that courts,

considering this kind of "discrimination" issue, have consistently held that trustees lawfully may increase benefits promised to workers not yet retired without increasing the benefits of those who have already retired. *See Toensing*, 528 F.2d at 72; *see also Cleary*, 841 F.2d at 449; *cf.* 29 C.F.R. § 2510.3–3(d)(2)(ii) (employee pension plan may buy out its continuing obligations to beneficiary by making lump sum payment or purchasing annuity).

Second, there is a "special circumstance" present here, but it does not change the result. That circumstance consists of the fact that, after the early 1980's, the value of the pension plan's investments increased far more than had been predicted. By 1990, the value of the plan's investments had increased by $12 million more than needed to pay the pensions owed and promised as of the mid–1980's. Past contributions by or on behalf of retired workers had made some of those fruitful investments possible. Consequently, those retired workers might seem entitled to share in the increased value of the investments, through a larger increase in the size of their pensions. The appellants argue that the comparatively small increase in the size of retired longshoremen's pensions denies them the share of the increase in investment value that is their due. *Cf. Cent. States, Southeast & Southwest Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 576 n. 18, 105 S.Ct. 2833, 2843 n. 18, 86 L.Ed.2d 447 (1985) ("Retirees … clearly are within the class to whom [ERISA] trustees owe a duty.").

The fatal flaw in this argument is that the record shows, without dispute, that the already-retired longshoremen (who accounted for *fewer* than two-thirds of all longshoremen) received *more* than two-thirds of the unexpected increase in investment value. An uncontested actuarial affidavit states that the increase amounted to $12 million above predicted levels; that $8 million was allocated to pay for the cost of increasing pensions for already-retired longshoremen; and that $4 million was allocated to help pay the cost of the pension increases promised to workers still at work (with future contributions presumably paying any remaining costs of pensions for this group). This allocation seems reasonable on its face. And, it seems obviously not arbitrary once one recalls that a perfect match between individual contribution and individual pension is neither a practical possibility in such circumstances, nor legally required for this kind of pension plan. *Elser*, 684 F.2d at 655 (quoting *Cent. Tool Co. v. Int'l Ass'n of Machinists Nat'l Pension Fund*, 523 F.Supp. 812, 817 (D.D.C. 1981)).

We can find no other "special circumstance" that might show the trustees' decision to have been arbitrary. The appellants point to the fact that the trustees did not provide a specific reason for their decision. Case law, however, while requiring us to evaluate trustees' actions in light of their "actual intent at the time," *Deak*, 821 F.2d at 579; *cf. Struble*, 732 F.2d at 334–35, does not require trustees to articulate their reasons formally, *see Foltz*, 865 F.2d at 374–75. The record before us indicates that the trustees simply followed the recommendations of the actuary and the union. It indicates that, as a general practice, they set working longshoremen's pensions on the basis of comparisons with pension plans in other ports. It indicates that some of the trustees may have believed they did not have to increase the level of pensions being paid to already retired workers. It also indicates that the actuary believed the pension levels, and the division of the "surplus," were actuarially reasonable. These reasons and facts are consistent with a fair, nonarbitrary decision. And the resulting decision, as we have said, is not arbitrary on its face. Under these circumstances, the law does not require the trustees to do more.

The judgment of the district court is

*Affirmed.*

## APPENDIX

**Retirement date:**

| Monthly Pension, voted on: | 10/1/86 (yrs) | (amt) | 9/1/88 (yrs) | (amt) | 9/1/89 (yrs) | (amt) | after 9/1/89 (yrs) | (amt) |
|---|---|---|---|---|---|---|---|---|
| before 3/87 | 25 | $ 700 | | | | | | |
| | 30+ | $ 750 | | | | | | |
| 3/87 | 25 | $ 750 | 25 | $ 875 | | | | |
| | 30+ | $ 800 | 30 | $1050 | | | | |
| | | | 40 * | $1400 | | | | |
| 4/88 | 25 | $ 775 | 25 | $1000 | | | | |
| | 30+ | $ 825 | 30 | $1200 | | | | |
| | 40+ | $1600 | | | | | | |
| 4/89 | 25 | $ 785 | 25 | $1010 | 25 | $1100 | | |
| | 30+ | $ 835 | 30 | $1210 | 30 | $1320 | | |
| | | | 40+ | $1610 | 40+ | $1760 | | |
| 3/90 | 25 | $ 825 | 25 | $1050 | 25 | $1140 | 25 | $1312.5 |
| | 30+ | $ 875 | 30 | $1250 | 30 | $1360 | 30 | $1575 |
| | | | 40+ | $1650 | 40+ | $1800 | 40+ | $2100 |

* "Forty year cap" on years of service counted in pension calculation did not apply; those with more than 40 years could receive more than $1400.