Thomas C. WILLIAMS,
et al., Plaintiffs,

v.

WCI STEEL CO., INC., United
Steel Workers of America,
et·al., Defendants.

No. 4:96CV0134.

United States District Court,
N.D. Ohio.

Oct. 6, 2000.

Christopher J. Carney, Brouse & McDowell, Akron, OH, for plaintiffs.

Patrick K. Wilson, James L. Blomstrom, Harrington, Hoppe & Mitchell, Youngstown, OH, Jeffrey S. Russell, St. Louis, Mo, Mark A. Rock, Cleveland, OH, Julia Penny Clark, Robert M. Weinberg, Bredhoff & Kaiser, Washington, DC, for defendants.

## MEMORANDUM OPINION AND ORDER

ECONOMUS, District Judge.

This matter is before the Court upon the motions of the Defendants, WCI Steel, Inc. ("WCI"), Thomas A. Fair ("Fair"), United Steel Workers of America ("USWA"), and Raymond W. MacDonald ("MacDonald"), for summary judgment (Dkt.# 105 & # 106). The Plaintiffs, Ray L. Reber ("Reber") and Roosevelt Cook ("Cook"), have amended their complaint to reflect the decision of the Sixth Circuit in *Williams v. WCI*, 170 F.3d 598, (1999), and assert that the Defendants violated § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, by (1) diverting a portion of the funds from a trust (the Security Enhancement Trust, or "SET") which was established for the benefit of a defined group of employees known as "Recipient Employees," and (2) distributing funds from the SET disproportionately, or unfairly, among the same group of employees.

For the following reasons, the Defendants' summary judgment motions (Dkt.# 105 & # 106) are **GRANTED**.

## FACTS

The Sixth Circuit has succinctly summarized the background facts of this case as follows:

Defendant-appellee WCI owns and operates a steel manufacturing facility in Warren, Ohio, which it purchased from LTV Steel Company ("LTV") in 1988. Defendant-appellee USWA represented employees of the facility both before and after the sale to WCI. Fearful that the change in ownership would adversely affect the workers of the facility, the sale was conditioned upon the entering of an agreement (the "Memorandum Agreement") to provide funding of certain benefits in the event that WCI, a new company with no historic labor record, shut down the facility and was unable to

pay liabilities to the union and its members.

The Memorandum Agreement was formulated between LTV and its workers on August 30, 1988. Among other things, the Memorandum Agreement called for the creation of a Security Enhancement Trust ("SET") funded by WCI in the amount of $21 million. The SET was formally created in November 1990 by LTV, USWA, and the Bank One Trust Company. Additionally, the Memorandum Agreement called for the appointment of two trustees. Defendants-appellees McDonald and Fair were the trustees appointed by USWA and WCI, respectively.

Only one of the provisions of the Memorandum Agreement is at issue in this appeal. The Memorandum Agreement stated that, if the facility did not close within seven years, then within 30 days thereafter, the funds specified above would be used to "provide employee and/or retiree benefits for Recipient Employees and the SET shall be dissolved." J.A. at 39. "Recipient Employees" were defined as employees of the facility who were participating in the LTV pension plan at the time of the sale. J.A. at 38. At the close of the seven-year period in 1995, some Recipient Employees remained as active WCI employees and some, including the named plaintiffs in this appeal, had retired.

The facility was not shut down during the seven-year period and, by 1995, the SET assets had grown to $28,400,000. However, a bitter and prolonged strike began at the facility one day after the seven-year period expired. In October 1995, pursuant to a new collective bargaining agreement, USWA and WCI agreed to an allocation of the residue of the SET assets. The assets were used to provide initial funding for a new WCI pension plan, to provide retiree life and health care benefits, and to fund bonuses for Recipient Employees.

170 F.3d at 600–601. The Plaintiffs admit that "the exact nature of the benefits to be provided [if WCI ceased operations within the seven year period] was not specified." (Resp. in Opp. to Defts.' Motions for Summ. J. at 4.) The trustees appointed by WCI and the USWA, Fair and MacDonald respectively, were to make the decisions regarding how the SET assets were distributed. (*Id.*)

The relevant portion of the Memorandum Agreement states:

D. If there has not been a permanent closing of the Warren Works during the Seven–Year Period, and after depositing the remaining Increased Contributions described in Paragraph A and B above, the assets remaining in the SET, within thirty days, shall be allocated by the Trustees to provide *employee and/or retiree benefits for "Recipient Employees"* and the SET shall be dissolved.

(Emphasis added.) At the time the SET assets were to be distributed, the Plaintiffs' assert that two subgroups of Recipient Employees existed: (1) active Recipient Employees, who were employed by WCI as of August 31, 1995, and represented by the USWA; and (2) retired Recipient Employees, who were employed at LTV at the time of the closing of the sale of the Warren Works from LTV to WCI on August 30, 1988, and who subsequently became employees of WCI, and either retired, died, became disabled, or transferred to salaried positions prior to August 31, 1995. In other words, the term "retired Recipient Employees" defines the group of Recipient Employees who were not actively employed by WCI on August 31, 1995.

As stated by the Sixth Circuit, the USWA and WCI agreed to a distribution of the SET assets as part of the settlement of the USWA's strike against WCI. This agreement on the distribution of SET assets was memorialized in the 1995 Memorandum Agreement. The Plaintiffs assert that WCI and the USWA "did not instruct Fair and MacDonald ... to distribute the assets of the SET Trust in a manner fair and nondiscriminatory to all the Recipient

Employees in accordance with their fiduciary duty to those Recipient Employees." (Resp. in Opp. to Defts.' Motions for Summ. J. at 6.) Rather, the Plaintiffs contend that the Defendants violated the Memorandum Agreement in two ways: (1) by distributing money to WCI to reimburse it for benefit payments WCI made which were "unfairly allocated among the two subgroups of Recipient Employees;" and (2) by distributing money to WCI to reimburse it for payments "made by WCI which did not benefit any Recipient Employee." (*Id.* at 6–7.)

In order to fully grasp the Plaintiffs' claims, it is necessary to understand exactly what benefits were paid from the SET and to whom. The first money paid out of the SET after August 31, 1995, established a "defined *benefit* pension plan." A defined benefit pension plan is a type of pension plan which guarantees a stream of income to retirees. (Declaration of Karin S. Feldman ¶ 7.) The income stream is determined using a formula that incorporates years of service and either the compensation received at the time of retirement or a flat benefit multiplier. (*Id.*) A "defined *contribution* pension plan," another type of pension plan, does not guarantee a specific amount of retirement income. (*Id.*) Rather, under this type of plan, an employer makes specified contributions to the plan during the employee's tenure with it and, upon retirement, the employee receives a pension based upon whatever amount is in his or her account. (*Id.*) The difference between the two, as the Plaintiffs point out, is that under a defined benefit pension plan, the employer bears the risk inherent in the plan's investments, and, under a defined contribution pension plan, the employee bears that risk. (Feldman Declaration ¶ 8.) The Plaintiffs contend that employees typically prefer a defined benefit pension plan over a defined contribution pension plan.

LTV maintained a defined pension benefit plan for its employees through 1987, when that plan was terminated. When WCI acquired the Warren works through 1995, WCI maintained a defined contribution pension plan. (Declaration of Cary Burnell ¶ 7.) The USWA, in its collective bargaining negotiations with WCI in 1995, sought the establishment of a defined benefit pension plan for active Recipient Employees. (Feldman Declaration ¶ 9.) The USWA and WCI agreed to establish such a plan for active Recipient Employees by causing MacDonald and Fair to distribute to WCI $14 million held in the SET to reimburse WCI for a $14 million payment it made to establish the defined benefit pension plan.[1]

Retirement benefits from the 1995 defined benefit pension plan, were only paid to employees of WCI who were active on or after August 31, 1995. Cook, Reber, and all of the members of the putative class they represent were not employed by WCI on or after August 31, 1995, and as such, received no benefit from the $14 million disbursed from the SET to WCI for the creation of the defined benefit pension plan. As retired Recipient Employees, the Plaintiffs did not benefit in any way from this distribution of SET assets. However, the Plaintiffs do not contend that employees other that Recipient Employees received any benefit from the distribution of these SET assets. Rather, they concede that the $14 million distribution from the SET went only to active Recipient Employees. (Resp. in Opp. to Defts.' Motions for Summ. J. at 8.) The Defendants do not dispute these facts.

The Plaintiffs emphasize that the financial impact on retired Recipient Employees, as a result of the distribution of SET assets to a defined benefit pension plan which benefitted active Recipient Employees, was quite severe. For example, Cook

---

1. The Plaintiffs, however, do not contest the fact that as retired Recipient Employees they were no longer represented by the USWA during the 1995 collective bargaining negotiations that resulted in the creation of the defined benefit pension plan. (*See* Memo. in Support of USWA and MacDonald's Mot for Summ. J. at 9; *see also* Pls.' Resp. in Opp. to Defts.' Mots. for Summ. J. at 5.)

was employed from July 20, 1955, until his retirement on February 1, 1995. (Cook Aff. ¶ 2.) Cook currently receives, before taxes, $916.00 per month in pension benefits. (Cook Aff. ¶ 10.) Had Cook retired on September 1, 1995, after the establishment of the defined benefit pension plan, he would have received at least $1,650.00 per month in pension benefits. (*Id.*) Reber, was employed at the Warren Works from some time in 1959 until his retirement in June, 1995. (Reber Aff. ¶ 2.) Had Reber retired on September 1, 1995, he would have received $1,350.00 in monthly pension benefits from the defined benefit pension plan. Instead, he receives $565.56 per month in pension benefits.

WCI and the USWA also agreed that another disbursement from the SET of $2 million would be used to reimburse WCI for "its initial contribution of $2 million to a Voluntary Employees' Beneficiary Association (VEBA), through which retiree life and health benefits would be funded." (Feldman Declaration ¶ 5.) The Plaintiffs emphasize that WCI had an obligation to provide health care and life insurance benefits to its retirees under "a pre-existing agreement with the [USWA]." (Feldman Declaration ¶ 12.) The Plaintiffs further assert that WCI was able to satisfy a pre-existing $2 million obligation with money from the SET. The Plaintiffs conclude, therefore, that when $2 million of SET assets were used to reimburse WCI for a pre-existing obligation to provide life insurance and health care benefits, no Recipient Employees received any benefit as a result of that disbursement which they were not already entitled to receive from WCI.

The Defendants state that a 1995 Memorandum Agreement between the USWA and WCI specifically provides that the $2 million paid by the SET to reimburse WCI for its $2 million contribution to the VEBA for health care and life insurance benefits was to be used solely for the benefit of Recipient Employees. (Declaration of John Jacunski ¶ 4.) The Defendants have provided the following detailed summary of how the $2 million contribution to the

VEBA was allocated: (1) As of March 31, 2000, the VEBA paid out $1,591,385.00 for retiree health care expenses and had a market value of $18,434,847.66 (Ex. H, attached to Jacunski Declaration); (2) three non-Recipient Employees received benefit payments from the VEBA totaling $14,294; (3) the remaining $1,577,091 was used to provide benefits for Recipient Employees. The Defendants contend that "none of the $2 million contribution from the SET was used to fund benefits for the three non-Recipient Employees." (Jacunski Declaration ¶ 13.) Rather, WCI contributed more than $10 million in additional funds to the VEBA which presumably covered the amounts paid to non-Recipient Employees. (*Id.*)

The third and final benefit paid for using SET funds, and which the Plaintiffs contest, is a "special bonus" given to all Recipient Employees, including Cook and Reber, and the putative class which they represent. Karin S. Feldman, in her Declaration in Support of the Motion for Summary Judgment, which the Plaintiffs rely upon in their factual statement, succinctly described the special bonus calculation. She stated:

13. [C]ertain Special Bonus Payments were made from the SET to Recipient Employees. The amount of the Special Bonus Payments was calculated based upon a formula set forth in Attachment A to the 1995 MOA. Based upon that formula, any person accruing service with LTV Steel at the time of the sale, August 31, 1988, would receive a credit of seven years. Persons who continued to accrue service with WCI between August 31, 1988 and August 31, 1995, with certain limited exceptions, were also given credit for the duration of that service. Each employee's Special Bonus Payment was based upon the ration of his individual credit compared to the total credits of all employees.

14. Thus, any individual employed by LTV Steel on August 31, 1988, regardless of the number of years he or she

had served up to that time received a seven-year credit. That automatic seven-year credit ensured that no employee initially hired after August 31, 1988 (a non-Recipient Employee), could receive a larger Special Bonus Payment than a Recipient Employee.

15. The formula described in Paragraph 13 above did not take into account all years of service that employees earned with LTV Steel or Republic Steel, one of LTV's predecessor companies. Any formula for bonuses based upon total years of service would have diminished service under WCI to near insignificance. By determining Special Bonus Payments using a maximum fourteen year credit, WCI and the Union were able to reward employees for service with WCI (and thus for their contribution to the success of WCI) as well as for some of their service with LTV Steel. The group receiving the maximum credit of fourteen years included a substantial number of Recipient Employees.

16. Although non-Recipient Employees also received Special Bonus Payments based upon the years of service accumulated between August 1988 and 1995, the funds in the SET were not the source of these payments. Instead, these payments were funded by WCI out of its own assets.

The Plaintiffs do not contest that special bonuses were paid to non-Recipient Employees out of separate WCI funds which were not part of the SET. They only contest the manner in which SET assets were distributed as special bonuses among Recipient Employees.

The Court must note that the above facts were taken from the Plaintiffs' Response in Opposition to the Defendants' Motions for Summary Judgment (Dkt.# 113), except where noted. Upon reviewing the fact statements presented by all of the parties, the Court cannot find but a few insignificant differences among them. As such, the Defendants' actions in connection with the distribution of the SET assets are undisputed and the Court may determine as a matter of law whether the Defendants have breached their respective duties under § 301 of the LMRA.

## SUMMARY JUDGMENT

Fed.R.Civ.P. 56(c) governs summary judgment and provides, in pertinent part:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law.

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact, and for these purposes, the evidence submitted must be viewed in the light most favorable to the nonmoving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

"The burden on the moving party may be discharged if the moving party demonstrates that the non-moving party has failed to establish an essential element of his or her case for which he or she bears the ultimate burden of proof at trial." *Morales v. American Honda Motor Co., Inc.*, 71 F.3d 531, 535 (6th Cir.1995). If the moving party meets this burden, then the non-moving party must present additional evidence beyond the pleadings. *Id.* The non-moving party must present more than a scintilla of evidence in support of his or her position. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment must be granted unless there is sufficient evidence favoring the non-moving party for a judge or jury to return a verdict for that party. *Id.* at 249, 106 S.Ct. 2505.

## ANALYSIS

Pursuant to Section 301 of the LMRA,

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a). The Plaintiffs have asserted that the Defendants violated this provision of the LMRA by depriving the Recipient Employees, and retired Recipient Employees in particular, of the benefit of the SET as required by the 1988 Memorandum Agreement. The Court will address each of the following issues: (A) whether the USWA and MacDonald are proper parties to this lawsuit; and (B) whether SET funds were diverted from Recipient Employees, or alternatively, whether SET funds were distributed unfairly among Recipient Employees.

**A. The Parties to this Lawsuit**

Both the Plaintiffs and the Defendants acknowledge that the USWA did not owe a duty of fair representation to the retired Recipient Employees.[2] Therefore, this lawsuit is a direct action against the Defendants for failing to fulfill their alleged obligations under the Memorandum Agreement. The USWA, however, argues that the Plaintiffs cannot bring such an action against them under the facts of this case.

The USWA asserts that the Supreme Court's decision in *United Steelworkers of America v. Rawson*, 495 U.S. 362, 110 S.Ct. 1904, 109 L.Ed.2d 362 (1990), is dispositive of the Plaintiffs' claim against them. In *Rawson*, the families of deceased mine workers brought state law wrongful death lawsuits against the USWA for the union's negligence in conducting mine safety inspections provided for in the collective bargaining agreement. The Court held that the plaintiffs in *Rawson*

could not maintain their lawsuit against the union because "Nothing in the collective-bargaining agreement suggests that it creates rights directly enforceable by the individual employees against the Union." *Id.* at 374, 110 S.Ct. 1904. The Court reasoned that the collective bargaining agreement between the employer and the union "consist[ed] entirely of agreements between the Union and the employer and [was] enforceable only by them." *Id.*

The Court further reasoned that "under traditional principles of contract interpretation, [the plaintiffs] have no claim [because] third-party beneficiaries generally have no greater rights in a contract than does the promisee." *Id.* at 375, 110 S.Ct. 1904. "For [the plaintiffs] to have an enforceable right as third-party beneficiaries against the Union, at the very least the employer must have an enforceable right as promisee." *Id.* The Court found that "the provisions in the collective-bargaining agreement relied on by [the plaintiffs] are not promises by the Union to the employer.[ ] They are, rather, concessions made by the employer to the Union." *Id.*

As in *Rawson*, nothing in the Memorandum Agreement between the USWA and WCI expressly created an obligation enforceable by individual Recipient Employees. Additionally, the USWA and MacDonald characterize the SET as a concession by LTV to provide benefits to Recipient Employees in the event the Warren Works closed within the seven year period after their sale to WCI, and that the USWA was merely involved as a trustee to ensure the "safekeeping" of the SET assets. The USWA further argues that the SET was a "carve-out from the employer's obligation to provide funding for benefit obligations, not a promise from the USWA to WCI or LTV." (Memo. in Support of Mot. For Summ. J. of Defts. USWA and MacDonald at 11.) Following this reasoning, the USWA concludes that the Recipient Employees had no enforceable rights as potential third-party beneficiaries to the Memorandum Agreement.

**2.** *See supra,* note 1.

■ The Court does not find the USWA's arguments meritorious. The Memorandum Agreement requires that

> If there has not been a permanent closing of the Warren Works during the Seven–Year Period, and after depositing the remaining Increased Contributions [ ], the assets remaining in the SET, within thirty days, shall be allocated by the Trustees to provide employee and/or retiree benefits for "Recipient Employees" and the SET shall be dissolved.

Based on this language, the Sixth Circuit found that the Plaintiffs have a vested right in the SET assets. *Williams,* 170 F.3d at 606. The court held that "[a]t the very least, a reasonable reading of the Memorandum Agreement supports plaintiffs' interpretation that *as 'Recipient Employees,' they were promised 'the assets remaining in the SET' at the expiration of the seven-year period."* *Williams,* 170 F.3d at 606 (emphasis added). The Sixth Circuit reasoned that

> the structure of the trust agreement as well as the circumstances of its formation indicate that the rights specified were vested in the former LTV employees. In this case, the trust provisions at issue were not incorporated within a collective bargaining agreement, but instead were memorialized in a separate Memorandum Agreement. Again, WCI was not a party to this agreement, and there were no provisions for its assignment. It is clear from the Memorandum Agreement that the trustees' responsibility was to make interim payments provided for in the agreement, to make the final allocations in the event that the plant did not close, and in that case, to wrap up the trust after seven years. In all respects, this was a self-contained, self-administering, and self-expiring trust.

*Id.* As a party to the Memorandum Agreement, and as co-trustee of the SET, the USWA undertook an obligation to distribute the SET assets to Recipient Employees upon the expiration of the seven year period ending August 31, 1995. Therefore, even in the absence of express language in the Memorandum Agreement, the Recipient Employees individually can enforce their right to the distribution of SET assets in which they had a vested interest. Because the Recipient Employees have a vested right in the SET assets, they can individually enforce the USWA's obligation to distribute those assets to them. As such, *Rawson* is inapplicable and the Plaintiffs have properly asserted a claim under § 301 of the LMRA.

**B. Allocation of SET Funds Among Recipient Employees**

The Plaintiffs raise three issues with respect to the distribution of SET assets. First, they contend that SET assets were diverted from Recipient Employees in some fashion. Second, the Plaintiffs assert that the SET assets were distributed among all Recipient Employees in an unfair and discriminatory manner which favored active Recipient Employees over retired Recipient Employees. Finally, the Plaintiffs argue that the Defendants breached their fiduciary duty to the retired Recipient Employees by treating them unfairly or impartially.

*1. Diversion of SET Assets from Recipient Employees*

The Defendants were not permitted to divert SET assets from Recipient Employees under the Memorandum Agreement. The Sixth Circuit, as noted above, held that the Recipient Employees have a vested right to the SET assets. In so holding, the court clearly explained the nature of the Recipient Employees' vested rights as follows:

> Plaintiffs . . . do not claim—nor can they under the reasoning of *Pierce* [3] that they have vested rights to a particular bene-

---

**3.** *Pierce v. NECA–IBEW Welfare Trust Fund,* 620 F.2d 589 (6th Cir.1980) (*per curium* ). In *Pierce,* the Sixth Circuit "affirmed the trial court's determination that no LMRA violation occurred when the trustees reduced the amount of health coverage afforded to eligible beneficiaries." *Williams,* 170 F.3d at 606 (*citing Pierce,* 620 F.2d at 590). The plaintiffs

fit, such as health coverage or life insurance. Rather plaintiffs are contending that they had a vested right in the distribution of the trust resources solely within the limited, defined named beneficiaries in the Memorandum Agreement.

*Williams,* 170 F.3d at 606. There is no dispute among the parties that the Memorandum Agreement requires that only Recipient Employees receive benefits from the SET. If any SET assets were distributed to non-Recipient Employees, the Plaintiffs would prevail on their claim against the Defendants. As detailed below, the Plaintiffs have failed to provide any evidence that SET assets were used for the benefit of non-Recipient Employees.

### a. Distribution to the New Pension Plan

The Plaintiffs, in their Memorandum in opposition to Defendants' Motions for Summary Judgment do not state that the Defendants diverted funds from Recipient Employees for the benefit of other non-Recipient employees, or for any other reason. The Plaintiffs admit that the funds were not diverted, and, of course, provide no evidence to the contrary. (*See* Mem. in Opp. to Defts.' Mots. for Summ. J. at 21; Affidavit of Brett R. Wise ¶ 6a.)[4] However, the Plaintiffs claim that the Defendants' payment of $14 million to WCI to reimburse it for a contribution in the same amount to the defined benefit pension plan was unfair because it did not benefit retired Recipient Employees. (Mem. in Opp. to Defts.' Mot. For Summ. J. at 17.) As such, there is no genuine issue of material fact as to whether the Defendants diverted these funds from Recipient Employees.

### b. Distribution of Special Bonuses

The Plaintiffs also do not argue that the $12 million paid by the SET to WCI to reimburse it for payments in that amount, which it made in special bonuses to all Recipient Employees, were diverted from Recipient Employees. It is not surprising, then, that the Plaintiffs have not produced any evidence to show a diversion of the SET assets used to pay special bonuses. The Plaintiffs instead admit that the special bonus payments were made to Recipient Employees, but protest that the bonus was structured to favor active Recipient Employees. (Mem. in Opp. to Defts.' Mot. For Summ. J. at 17.) Therefore, there is no genuine issue of material fact as to whether the Defendants diverted SET funds used for Special bonus payments from Recipient Employees for another purpose.

### c. Distribution to the VEBA

The Plaintiffs do not contend that the $2 million contribution made by the SET to the VEBA was diverted from all of the Recipient Employees. The Plaintiffs state that $2 million was paid from the SET to the VEBA to provide health care and life insurance benefits which WCI had a pre-existing obligation to provide. The Plaintiffs further assert that "[n]o Recipient Employee, and in particular, no retired Recipient Employee, received any benefit as a result of that distribution that he or she was not already entitled to receive." (Mem. in Opp. to Defts.' Mots. For Summ. J. at 22.) The Plaintiffs base their argument on the absence of language in the SET authorizing the Defendants to distribute SET assets in satisfaction of pre-existing obligations.[5] Despite their

---

in *Pierce* sought a particular benefit under the Trust Agreement governing their health care coverage. *Id.* The court explained that "the Trust Agreement in *Pierce* specifically gave discretion to alter the benefit rules for participation in the trust agreement." *Id.* (*citing Pierce,* 620 F.2d at 590).

4. Wise states in his affidavit that "[t]he New Pension Plan will maintain the assets distrib-

uted from the SET in a Special Account for the benefit of Recipient Employees." The Wise Affidavit is attached as Exhibit C to the Plaintiffs' Memorandum in Opposition to Defendants' Motions for Summary Judgment.

5. The only limiting language contained in the SET provision at issue here is that SET assets be distributed for the benefit of Recipient Employees. Otherwise, the Defendants had

protestations, however, the Plaintiffs admit that the SET was established for the primary purpose of providing "additional security to employees of the Warren Plant and to fulfill LTV's obligations to certain employees under the LTV Steel–USWA Pension Plan." (Affidavit of Ray L. Reber ¶ 5.) Moreover, the Plaintiffs do not argue that they did not receive any benefit, but that "[t]he effect of [the distribution to the VEBA from the SET] is that retired Recipient Employees received *less* than they otherwise should have received from the SET...." (Mem. in Opp. to Defts.' Mots. For Summ. J. at 23.) (Emphasis added.) The Plaintiffs, therefore, received some benefit from the distribution of SET assets to the VEBA.

Furthermore, there is no evidence that any SET assets contributed to the VEBA were used to benefit non-Recipient Employees. The undisputed evidence establishes that "all WCI retirees—including plaintiffs—are eligible to receive benefits from the VEBA, but the SET money is restricted by the 1995 [Memorandum Agreement] so that the $2 million contributed to the VEBA can only be used to pay for retiree health care and life insurance benefits for Recipient Employees." (Mem. in Support of Mot. for Summ. J. of Defts. USWA and MacDonald at 14–15.) (*See also* 1995 Memorandum Agreement ¶ 4.) The Defendants have provided additional evidence, which the Plaintiffs do not contest, that as of March 31, 2000, "only a few non-Recipient Employees had received benefit payments from the VEBA, totaling $14,294; none of these payments drew upon the $2 million originally contributed to the SET." (*Id.*) (*See* Jacunski Aff. ¶ 13.) Thus, the Court concludes that no SET assets were diverted from Recipient Employees and that there is no genuine issue of material fact with respect to payment of the $2 million from the SET to the VEBA.

In sum, the Plaintiffs' quarrel is with how the SET assets were distributed among Recipient Employees. This issue will be addressed below.

### 2. Unfair and Discriminatory Distribution of SET Assets by the Defendants

The Plaintiffs argue that the actual distribution of SET assets among retired and active Recipient Employees was both unfair and discriminatory. The Plaintiffs assert that they were entitled to an alternative distribution of SET assets which resulted in payment of a greater amount of benefits to retired Recipient Employees. The Plaintiffs suggest that the SET assets could have been distributed to all Recipient Employees and provide the following examples: (1) all Recipient Employees could have received cash payments based upon their total years of service with WCI and its predecessor companies; or (2) all Recipient Employees could have received cash payments based on a per capita basis. (Mem. in Opp. to Defts.' Mots. for Summ. J. at 11.) Either of these examples of alternative distributions of SET assets, from the Plaintiffs' perspective, would have been a fair allocation of SET assets.

█ The Memorandum Agreement does not provide any instructions as to how the SET assets should be distributed among Recipient Employees, except that only Recipient Employees can receive distributions from the SET. The Memorandum Agreement states that "the assets remaining in the SET, within thirty days, shall be allocated by the Trustees to provide *employee and/or retiree benefits* for Recipient Employees." (Emphasis added.) The Sixth Circuit has held that all Recipient Employees had a vested right in the SET assets. Also, the Sixth Circuit has held

maximum discretion to distribute SET assets. Moreover, the Recipient Employees did not forfeit any rights under the Memorandum Agreement and did not bargain away any rights set forth in that agreement during the 1995 collective bargaining negotiations.

Rather, the Defendants agreed upon an allocation of SET assets which benefitted all Recipient Employees. Whether the allocation of benefits among retired and active Recipient Employees was fair or proportional is a different issue entirely.

that only Recipient Employees were entitled to distributions of SET assets. Therefore, based on these two considerations, the Court concludes that retired Recipient Employees had a right to receive some unspecified benefit from the SET upon distribution of its assets. In other words, the trustees could not distribute all of the SET assets in favor of active Recipient Employees to the exclusion of retired Recipient Employees. To allow the trustees to do so would violate the undisputed purpose for which the SET was established—"to provide additional security to employees of the Warren Plant and to fulfill LTV's obligations to certain employees under the LTV Steel–USWA Pension Plan." (Reber Aff. ¶ 5.) However, that is not the case here. Retired Recipient Employees in fact received some benefit payments as a result of the distribution of SET assets.

Despite their entitlement to some SET benefit, the Plaintiffs cannot claim a right to a particular benefit. The Sixth Circuit foreclosed such a claim by the Plaintiffs in *Williams. See id.* at 606. Nonetheless, a particular benefit is precisely what the Plaintiffs request when they propose alternative distributions of the SET assets. For the Plaintiffs to claim that the distribution of SET assets was unfair and discriminatory and to request an alternative distribution, is tantamount to a request for a particular distribution of the SET assets.

■ The Plaintiffs argue that "nothing in the language of the [Memorandum Agreement] indicated that the disposition of the trust residue was to be the subject of future collective bargaining or that the rights provided by these agreements could be forfeited." *Williams,* 170 F.3d at 606. However, the 1988 Memorandum Agreement did not provide any specific language as to how the SET assets were to be distributed among Recipient Employees.

The terms of distribution for the SET assets were not altered by the 1995 collective bargaining agreement or the 1995 Memorandum Agreement. Rather, in the 1995 Memorandum Agreement, the USWA and WCI, for the first time, agreed on the specific distribution of the SET assets. Although the retired Recipient Employees had a vested right to benefits from the SET, they had no claim to any particular benefit, and thus any agreement on a distribution plan for SET assets did not affect those vested rights so long as the retired Recipient Employees received some benefit from the SET. Moreover, there is no evidence that any rights to vested benefits were forfeited as a result of the 1995 collective bargaining agreement or the 1995 Memorandum Agreement.[6] As such, the retired Recipient Employees' vested right to some benefit from the SET was not infringed upon by the Defendants when they distributed the SET assets.

Accordingly, because SET assets were paid exclusively to Recipient Employees, regardless of the distribution among retired and active employees, the Defendants did not violate the Memorandum Agreement.

### 3. Breach of Fiduciary Duty

The Plaintiffs argue that the Defendants breached their fiduciary duty to the retired Recipient Employees by favoring active Recipient Employees in the distribution of SET assets. The Plaintiffs' argument is not specific, but rather a general challenge to the manner in which the SET assets were distributed by the Defendants. The Court must therefore determine whether fiduciary standards applied to the trustees of the SET, and if so, whether the trustees breached their fiduciary duty to the retired Recipient Employees.

---

**6.** Although it may be true that the agreement between WCI and the USWA as to how the SET assets would be distributed resolved the 1995 strike, the SET assets were not distributed outside of the Recipient Employees. Thus, those employees who were supposed to benefit from the establishment of the SET and the distribution of its assets received that to which they were entitled, even if it was not the amount which they desired.

The Defendants, citing *United Mine Workers Health & Retirement Funds v. Robinson*, 455 U.S. 562, 102 S.Ct. 1226, 71 L.Ed.2d 419 (1982), have persuasively argued that fiduciary standards do not apply when a decision is made as to the allocation of trust assets among beneficiaries during collective bargaining.[7] The statute at issue in *Robinson*, 29 U.S.C. § 186(c)(5), or alternatively § 302(c)(5) of the LMRA, requires "that an employee benefit trust fund be maintained 'for the sole and exclusive benefit of the employees ... and their families and dependents' ...." *Robinson*, 455 U.S. at 570, 102 S.Ct. 1226. The Court explained that "The statutory language hardly embodies [a] reasonableness requirement. Its plain meaning is simply that employer contributions to employee benefit trust funds must accrue to the benefit of employees and their families and dependents, to the exclusion of all others." *Id.* "The section was meant to protect employees from the risk that funds contributed by their employers for the benefit of the employees and their families might be diverted to other union purposes or even to the private benefit of faithless union leaders." *Id.* at 571–72, 102 S.Ct. 1226. The language of the 1988 Memorandum Agreement required the same of the Defendants—that the SET assets be distributed solely for the benefit of Recipient Employees and not diverted for any other purpose.

The Court rejected the argument that there is a reasonableness requirement in the statute at issue in *Robinson*, and noted that the respondents in that case could not provide any alternative Federal law to support their argument. *Robinson*, 455 U.S. at 574, 102 S.Ct. 1226. The Court held:

There is no general requirement that the complex schedule of the various employee benefits must withstand judicial review under an undefined standard of reasonableness. This is no less true when the potential beneficiaries subject to discriminatory treatment are not members of the bargaining unit; we previously have recognized that former members and their families may suffer from discrimination in collective-bargaining agreements because the union need not 'affirmatively ... represent [them] or ... take into account their interests in making bona fide economic decisions in behalf of those whom it does represent.' *Chemical & Alkali Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 181, n. 20, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971) Moreover, because infinite contributions must be allocated among potential beneficiaries, inevitably financial and actuarial considerations sometimes will provide the only justification for an eligibility condition that discriminates between different classes of potential applicants for benefits. As long as such conditions do not violate federal law or policy, they are entitled to the same respect as any other provision in a collective-bargaining agreement.

Likewise, in the case *sub judice*, the 1988 Memorandum Agreement did not contain any directives as to the distribution of the SET assets, but instead placed a single limitation on how they were to be distributed—only to Recipient Employees. The 1988 Memorandum Agreement contained no language which required any particular disbursement among retired and active Recipient Employees. The absence of such language leads this Court to conclude that the SET trustees had substantial discretion to distribute the assets among the Recipient Employees.[8] As such, according to the reasoning set forth in *Robinson*,

---

7. This Court has already found that prior to the 1995 Memorandum Agreement there were no guidelines or directives for the trustees to distribute the SET assets, except for the requirement that all SET assets be used for the benefit of Recipient Employees. Therefore, the collective bargaining that took place in 1995, did not alter the distribution of the SET assets, but determined how those assets would be distributed for the first time.

8. The Plaintiffs have not provided any case law which supports the imposition of either a reasonableness or a fiduciary standard upon trustees under the same or similar circumstances.

*supra,* neither a reasonableness nor a fiduciary standard apply to the decisions of the trustees in distributing SET assets among Recipient Employees.

Even if the Defendants were subjected to a fiduciary standard, or alternatively a standard of reasonableness, for their distribution of SET assets, no breach or unreasonable conduct occurred. If a fiduciary duty was to apply, the trustees would be subject to an arbitrary and capricious standard of review for their conduct. *See Stevens v. Employer–Teamsters Joint Council No. 84 Pension Fund,* 979 F.2d 444, 457–58 (6th Cir.1992). "A determination by plan trustees will not be found to be arbitrary or capricious if it is rational in light of the plan's provisions." *Abbott v. Pipefitters Local Union No. 522 Hospital, Medical, and Life Benefit Plan,* 94 F.3d 236, 240 (6th Cir.1996) (*citing Perry v. United Food and Commercial Workers Dist. Unions 405 and 442,* 64 F.3d 238, 242 (6th Cir.1995)). Moreover, "This standard 'is the least demanding form of judicial review of administrative action. . . . When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Id.* (*citing Perry,* 64 F.3d at 242). It is within this framework that the Court will evaluate the Defendants' conduct with respect to the distribution of SET assets.

The Court finds instructive the opinion of the First Circuit in *Mahoney v. Board of Trustees,* 973 F.2d 968, 971 (1992). Then Chief Judge Stephen Breyer, writing for the court, summarized the relevant trust law that governs fiduciaries who have the power to allocate benefits among multiple beneficiaries. The First Circuit stated:

> [Trustees] have the power to do acts that are 'necessary or appropriate to carry out the purposes of the trust and are not forbidden by the terms of the trust' Restatement (Second) of Trusts § 186. Moreover, '[w]here discretion is conferred upon the trustee with respect to the exercise of power,' including the 'power[ ]to allocate the beneficial interest among various beneficiaries,' ordinarily the trustee's 'exercise is not subject to control by the court except to prevent an abuse of discretion.' *Id.* § 187 & comment c;[9] *see also id.* § 183 comment a ('By the terms of the tryst the trustee may have discretion to favor one beneficiary over another.'); 3A Scott on Trusts § 232 (trustee's 'duty of impartiality . . . ordinarily' gives him 'considerable discretion' in deciding the 'balance' between successive beneficiaries.

*Mahoney,* 973 F.2d at 971. The First Circuit held that "[I]n the absence of some special circumstance, it does not seem arbitrary or capricious for trustees, to whom the trust agreement gives discretionary powers in setting pension benefit levels, to promise current workers much larger pension increases than those paid to workers who have already retired." *Id.* at 973.

As an initial matter, the Court finds that the SET assets were distributed exclusively to Recipient Employees and that all Recipient Employees benefitted in some way from their distribution. Furthermore, the Court finds that the trustees of the SET, because of an absence of any language either in the SET or the 1988 Memorandum Agreement which governs distribution of SET assets, had broad discretion to distribute SET funds for the benefit of Recipient Employees. Nonetheless, the distribution of SET assets will be reviewed according to the three types of benefits paid from them.

9. Section 187, comment c states:

The rule stated in this Section is applicable both to the powers of managing the trust estate conferred upon the trustee either in specific words or otherwise, and also to such powers as may be conferred upon him to determine the disposition of the benefi-cial interest. Thus, it is applicable not only to powers to lease, sell or mortgage the trust property or to invest trust funds, but also to powers to allocate the beneficial interest among various beneficiaries, to determine the amount necessary for a beneficiary's support, or to terminate the trust.

### a. Distribution to the New Pension Plan

 The Defendants admit, and the Plaintiffs' acknowledge, that "[t]he $14 million allocated to the defined benefit plan was [ ] intended to benefit the active [Recipient Employee] group that comprised over two-thirds of the Recipient Employees." (Reply Mem. in Support of Defts. USWA and MacDonald Mot. for Summ. J. at 12; Mem. in Opp. to Defts.' Mot. for Summ. J., Ex. D, King Affidavit, Ex. III.) There is no dispute, therefore, that the retired Recipient Employees, those Recipient Employees who retired before August 30, 1995, receive a lower amount of retirement benefits than those Recipient Employees who retired on or after August 31, 1995. There is also no dispute that the new defined benefit pension plan provides additional security for the retirement benefits of Recipient Employees retiring on or after August 31, 1995. (*See* Feldman Declaration ¶ 7.) Furthermore, the Plaintiffs do not dispute the contention that "it is standard in the steel industry, and indeed among pension plans in general, that retirees are covered by the retirement plan in place at the time of their retirement." [10] (Feldman Declaration ¶ 11.) As such, the Plaintiffs have not shown that the Defendants acted in an arbitrary or capricious manner in providing additional security for pension benefits for active Recipient Employees (approximately two-thirds of the total number of Recipient Employees), while the remainder, the retired Recipient Employees, received no less than what they were entitled to under the pension plan governing them at the time of their retirement.

### b. Distribution of Special Bonuses

The undisputed evidence offered by the Defendants establishes that all Recipient Employees received a seven year credit for their service to LTV, including those Recipient Employees who, as of 1988, had been employed by LTV for less than seven years. According to the Defendants' calculations, "[g]iven the composition of the WCI workforce in 1995, any calculation based upon a straight service-credit calculation—that is, a number of credits directly equal to the number of years served—would have disproportionately weighted the years of LTV service over the years that employees had served with WCI." (Mem. in Support of Mot. for Summ. J. of Defendants USWA and MacDonald at 19.) Using a straight calculation of bonuses based on total number of years of service to both LTV and WCI, "would have greatly diminished the bonus amount that could have been paid as a result of WCI employees' service after August 31, 1988, including post–1988 service with WCI of those Recipient Employees who continued to work for the Company." (*Id.*) The manner in which the special bonuses were calculated by the Defendants: (1) ensured that Recipient Employees received a greater amount than non-Recipient Employees (who were paid out of WCI corporate assets and according to the same formula used in calculating the special bonuses for Recipient Employees), and (2) guaranteed that Recipient Employees received a bonus both for their prior service to LTV and their actual service to WCI during its first seven years of operation. (*See id. See also* Burnell Declaration ¶ 17, ¶¶ 14–16.)

 The Plaintiffs have not disputed the facts of the Defendants' explanation, but rather challenge the distribution of special bonuses as unfair and discriminatory. Without more, this Court cannot conclude that the Defendants' distribution of SET assets in the form of special bonuses was arbitrary and capricious.

### c. Distribution to the VEBA

 This Court has already found that the distribution of SET assets to the

---

**10.** The contention is logical considering that unions generally do not have an obligation to represent already retired members in collective bargaining.

VEBA exclusively benefitted Recipient Employees, notwithstanding the claim that WCI owed such benefits under a pre-existing obligation. There is no dispute that the VEBA provides health care and life insurance benefits for all Recipient Employees and that no such benefits were paid to non-Recipient Employees from Set funds contributed to the VEBA. Because all Recipient Employees benefitted from the distribution of SET assets to the VEBA, the Plaintiffs cannot reasonably allege, and the Court cannot find, any evidence of arbitrary or capricious conduct.

In summary, even if fiduciary standards applied to the trustees, the Court could not conclude, based on the undisputed evidence before it, that the trustees acted in an arbitrary or capricious manner when they distributed the SET assets among the Recipient Employees.

## CONCLUSION

Based upon the foregoing, the Defendants are entitled to summary judgment as there are no genuine issues of material fact with respect to the distribution of SET assets to and among Recipient Employees. The Defendants did not violate § 301 of the LMRA when they distributed the SET assets as they did. Accordingly, the Defendants' Motions for Summary Judgment (Dkt. # 105 & # 106) are hereby **GRANTED**.

**IT IS SO ORDERED.**