DECISION
Before this Court is a Petition seeking an Order approving early termination of the Federick Henry Prince Trust, dated June 3, 1932 (Trust) brought by Federick H. Prince IV of Washington, D.C. and William Norman Wood Prince of Chicago, Illinois, in their capacity as trustees and with the agreement of the adult beneficiaries of the Trust (Adult Beneficiaries). The petitioners seek an order that: (1) approves of the Settlement Agreement dated June 13, 2007 (Settlement Agreement); (2) finds that the terms of the Settlement Agreement are fair and in the best interests of all beneficiaries of the Trust; (3) is binding on all parties to the Settlement Agreement, the minor, unborn, and unascertained beneficiaries of the Trust, and the Attorney General of the State of Rhode Island granting judicial termination of the Trust pursuant to the terms of the Settlement Agreement; and (4) grants any and all additional relief that this Court *Page 2 
deems equitable and just. Jurisdiction is pursuant to the provisions of the Uniform Declaratory Judgments Act, G. L. 1956 §§ 9-30-1 — 9-30-16.
 I Facts and Travel
A. The Litigation
A trust accounting proceeding (the Accounting Litigation) known asWood Prince v. Lynch, C.A. No. 99-5806 has been pending before this Court since 1999. The Accounting Litigation involves parties who are family members and beneficiaries of the Trust as well as the Attorney General of Rhode Island. Many of the issues in dispute involve the construction and administration of the Trust, and the interpretation of the intent of Frederick Henry Prince, the settlor (the Settlor) of the Trust. Other issues involve claims related to the administration of F.H. Prince Co. Inc. (the Company), a company solely-owned by the Trust since its creation in 1932. Still, other issues involve claims against the Trustees for breach of fiduciary duty. All of these issues are disputed. See Settlement Agreement at 10-16.
The Accounting Litigation has had a devastating financial cost to the Trust.[1] (Tr. 9: 20-25 and 10: 1-2.) The legal fees and costs incurred by the parties to this litigation have been paid by the Trust pursuant to Court Orders, most recently the Court Order dated June 5, 2006. (Tr. 44: 6-9.) The Accounting Litigation has had an equally devastating effect on the relationships between and among the Prince and Wood Prince family members, who are the beneficiaries of the Trust. It is likely that family relationships will continue to deteriorate if litigation continues. (Tr. 10: 18-25 and 11: 1-2.) *Page 3 
 The Trust
The Trust is an irrevocable trust governed by the laws of the State of Rhode Island. The natural termination date of the Trust would be January 22, 2019, which is twenty-one years after the last to die of ten now deceased individuals who are named in the Trust. (Trustees' Memorandum of Law in Support of the Prince Family Settlement Agreement; TML 3; Tr. 12: 10-22.) The current assets of the Trust consist of a significant amount of cash or cash equivalents, as well as substantial resources located in a holding company that is an investment vehicle for a small amount of cash, stocks, alternative investments, and private equity investments.[2] (Tr. 11: 18-24.) The Trust distributes fixed income payments to certain beneficiaries every year.[3] These distributions are made on the basis of certain factors, including gender, per stirpital standing, and relationship by marriage. Certain of these distributions are also tied to employment with the Company. (TML 4; Trust, Article II, Section 1.) No distributions of principal are made at this time, and principal will not be distributed until the Trust terminates. (Tr. 12: 12-19; TML 4.)
The Trust provides that upon termination, principal will be divided in half (the respective halves are referred to herein and in the Settlement Agreement as the Non-Discretionary Half and the Discretionary Half). The Non-Discretionary Half is to be divided further upon termination: seventy-five percent (75%) of the Non-Discretionary Half is distributable to and among the persons entitled to the net income of the Trust estate under sub-divisions (b), (c), (g) and (h) of Section 1 of Article II of the Trust, in the *Page 4 
same percentages in which they receive income. The other 25% of the Non-Discretionary Half is distributable to charities. (Trust, Article II, Section 3.) The Trust directs the Trustees to distribute the Discretionary Half, in their absolute discretion, among male beneficiaries who are then serving the Company "as directors, officers or employees." (Trust, Article II, Section 3.)
B. The Company
In 1932, when the Trust was created, it held all of the stock of the Company (Tr. 12: 8-10), whose two primary assets were (a) the Union Stock Yards Transit Company, which was a holding company for the Chicago Stockyards (the Stockyards), the Chicago Junction Railroad, and the International Amphitheater, and (b) the Central Manufacturing District (CMD), which was a small real estate company at that time. (Tr. 15: 4-11.) The Stockyards were an enormous operation that saw tens of thousands of animals come through every day. It operated twenty-four hours a day, seven days a week and employed a large number of people. (Tr. 15: 14-21.)
The Stockyards closed in 1971. (Tr. 15: 12-13.) The closure of the Stockyards was the result of changes in the technology of meat refrigeration and transport, including the development of interstate trucking infrastructure and rail lines, which allowed other meatpacking sites and feedlots to be developed in other areas of the country. These changes in technology drastically reduced the amount of business that went through the Stockyards. (Tr. 20: 21-25 and 21: 1-5.) When the Stockyards closed, the Company focused on building its real estate business, CMD, which had become the biggest asset of the Company by 1979. (Tr. 21: 9-12 and 23: 1-3.) The Company also owned several operating companies, including Continental Freezers of Illinois (Continental Freezers), *Page 5 
which was a regional cold storage warehouse and logistics distribution business. The Company also maintained an investment portfolio. (Tr. 21: 10-25 and 22: 1-10.)
After the current Trustees took office in 1979, they engaged Boston Consulting Group to evaluate the Company's holdings and advise them regarding investment strategy. With the advice of the Boston Consulting Group, the Trustees adopted an investment plan referred to as the "three-legged stool" approach. Under this approach, they directed the Company to focus on CMD, Continental Freezers, and its investment holdings. (Tr. 24: 11-18.) The Company implemented this approach and sold off its other operating companies. (Tr. 24: 24-25 and 25: 1.) The Company sold Continental Freezers in 1997 with Court approval. (Tr. 27: 7.) The rationale for this sale was that increasing consolidation in the refrigeration business made retaining Continental Freezers impracticable unless the Company invested enough money to make it a national business, which was not financially prudent at the time. (Tr. 25: 23-25, 26: 1-25, and 27: 1-6.)
C. The Beneficiaries
There are currently thirty-three living beneficiaries of the Trust, including current and remainder beneficiaries, two of whom currently serve as Trustees. Sixteen of the beneficiaries are minors. (Sixth Amended Complaint 4-5) All of the Adult Beneficiaries have been represented by independent counsel. (Tr. 43: 18-21, 25 and Tr. 44: 1-4.) Guardians ad litem (GALs) were appointed by this Court to represent minor beneficiaries and unborn and unascertained beneficiaries. (TML 45.)
D. Previous Trust-Related Litigation
Disputes between and among the beneficiaries and the Trustees have plagued the Trust since 1959. Many of these disputes resulted in litigation. (Tr. 40: 8-18.) Over the *Page 6 
years, these disputes were ultimately resolved either through court-approved family settlement agreements or judicial decisions. In all cases, the Trust has paid the legal fees and costs of the beneficiaries related to these disputed matters with Court approval.
E. The Settlement Agreement
On June 13, 2007, the Trustees and Adult Beneficiaries signed the Settlement Agreement in order to resolve disputed issues in the Accounting Litigation and other disputed issues related to the Trust that have been ongoing for many years and that threaten future litigation. (Tr. 5: 9-12.) The Settlement Agreement is the product of years of extensive negotiations among the parties, their attorneys and advisors, including three lengthy meetings with three different alternative dispute resolution professionals (Tr. 43: 5-14; 25: 3-5; and 50: 17-23), several periods of impasse, and many hours of drafting.
Several professional advisors were retained by the Trust to provide independent advice to the Trustees, the Adult Beneficiaries, and the GALs, regarding the possible tax consequences of the Settlement Agreement and Addendum. For example, Deloitte Touche was retained by the Trustees to perform actuarial calculations of the present values of the beneficiaries' interests in the Trust. (Tr. 55: 13-20.) In addition, KPMG and PricewaterhouseCoopers were hired to advise various Adult Beneficiaries and GALs. (Settlement Agreement Schedule 6.) Finally, the Trust also retained two tax attorneys to assist with the private letter ruling request that the Settlement Agreement requires the Trustees to submit to the IRS and with questions the GALs raised about the private letter ruling request. See Report of the GAL for Isabella and Oliver Kiker at 28. Fees and *Page 7 
costs for all of these professionals have been paid by the Trust pursuant to Court Orders of June 5, 2006 and September 17, 2007.
The Trustees have considered the interests of all of the beneficiaries of the Trust and believe that the Settlement Agreement is in the best interests of the Trust. (Tr. 9: 4-15.) The Trustees and the Adult Beneficiaries both agree that termination of the Trust under the Settlement Agreement is the only way to end the emotional and financial strain on their families and the Trust, to settle their disputes, and to prevent years of additional and increasingly complex and expensive litigation. (TML 37.)
Lastly, it should be noted that on April 8, 2008, the Trustees and Adult Beneficiaries signed an Addendum to the Settlement Agreement to address certain concerns of the GALs. (Addendum 1.) These concerns and the Addendum are described below.
F. Petition for Court Approval of the Settlement Agreement
A hearing on the Petition was held on April 9, 2008, and sworn testimony of William Norman Wood Prince, as Trustee of the Trust, was heard. The Court finds that the Settlement Agreement was negotiated at arms length and reflects a reasonable resolution of bona fide claims raised by the parties to the litigation. (TML 40.) This Court has considered the record, including Mr. Wood Prince's testimony, the pleadings, the Settlement Agreement and Addendum, the Memorandum of Law filed by the Trustees, the Supplemental Memoranda of Law filed by the Trustees and the Adult Beneficiaries, the Reports of the GALs, and other motions, claims, and counterclaims submitted by the parties, and makes the following findings of fact. *Page 8 
 II Findings of Fact
A. Disputed Issues Resolved by the Settlement Agreement
The disputes resolved by the Settlement Agreement involve claims specifically raised in the Accounting Litigation, as well as other issues related to the Trust and family legacy. (Tr. 41: 2-11.) The claims currently in dispute involve the following:
 a. Allegations of breach of fiduciary duty against the Trustees. Among other things, certain beneficiaries claim that one of the Settlor's purposes was to provide meaningful employment opportunities for beneficiaries to allow them to participate in the Company and in distributions under the Discretionary Half and Article II, Section 1, paragraph (j)(II) of the Trust, but that the Trustees' investment policies have eliminated these opportunities by divesting the Trust of its operating companies. They also have alleged that the Trustees, who are also executives of the Company, have breached their duty of loyalty because they are the only beneficiaries to enjoy the employment opportunities contemplated by the Settlor, and that this breach has jeopardized the entitlement of other beneficiaries to Trust income and principal. The Trustees and other beneficiaries claim that the Trustees have not breached any fiduciary duties because the Trustees have complied with the terms of the Trust and their fiduciary duty of prudent investment and because their dual roles as Trustees and executives are contemplated in the Trust. They argue that the current lack of meaningful, fulltime employment opportunities has not resulted from any breach of fiduciary duty by the Trustees, but instead from the impossibility of providing such employment to the beneficiaries without jeopardizing the corpus of the Trust and the potential *Page 9 
rights of all beneficiaries. (Tr. 41: 2-11; TML 11-12; Settlement Agreement 10-16.)
 b. Allegations that the employment-related gender distinctions in the Trust are illegal, invalid, and are unenforceable as a violation of public policy and current federal and state anti-discrimination laws. Certain beneficiaries argue that although these distinctions were not illegal when the Settlor created the Trust, the subsequent enactment of federal and state anti-discrimination laws and the development of the law under the equal protection clauses of the United States Constitution and the Constitution of the State of Rhode Island (the Anti Discrimination Laws) have significantly changed the legal landscape with respect to employment discrimination based upon gender. See Civil Rights Act of 1964 § 703, 42 U.S.C.S. § 2000e-2
(making it unlawful to refuse to hire any applicant for employment because of his or her sex); G.L. 1956 § 28-5-7 (as reenacted in 2003); (TML 12-13; Settlement Agreement 11-13.)
 c. Allegations that the terms of the Trust are no longer workable and that the Trust should therefore be terminated. Certain beneficiaries have claimed that changed circumstances that could not have been anticipated by the Settlor have made it impossible for the Trust's purposes to be accomplished. Other beneficiaries disagree and believe that, in the absence of the continuous litigation, it would still be possible to accomplish the Trust purposes. (Settlement Agreement 14-16.)
 d. Allegations that a construction of the Trust is necessary because the Trust contains inherent ambiguities regarding trustee succession and conflict of interest. (ABM 34; see also TML 3.) *Page 10 
 e. Allegations that members of the Elizabeth Prince family line have had no historical role in the administration and governance of the three Prince charitable trusts.
 1. Employment of Beneficiaries
Several of the disputed issues in the Accounting Litigation stem from the employment provisions of the Trust. (Tr. 14: 6-8.) Certain Trust benefits are tied to employment. (Tr. 12: 23-25.) Male beneficiaries serving the Company receive fixed income payments. (Tr. 13: 1-5.) At termination of the Trust, the Trust provides that the Trustees are to distribute the Discretionary Half in their sole discretion among male beneficiaries who are serving the Company as directors, officers, or employees. (Tr. 13: 17-21.) The Trust does not provide any allocations or standards for the distribution of the Discretionary Half. (Tr. 14: 2-5.)
One of the disputes regarding employment opportunities under the Trust stems from the uncertainty regarding the distribution of the Discretionary Half. (Tr. 35: 12-21.) Distribution of this half of Trust principal is discretionary, and male beneficiaries working in part-time positions have concerns that this type of employment will weigh against discretionary distributions to them as compared to beneficiaries who have fulltime employment with the Company. (Tr. 35: 15-25 and Tr. 36: 1-2.) Due to changes in circumstances over time, however, full-time, meaningful, day-to-day employment opportunities with the Company are scarce. (Tr. 14: 19-23.) The Company does not have full-time employment opportunities available for beneficiaries that would allow them to be actively involved with the Company in the same way that the Trustees and previous Trust beneficiaries were involved with the Company. (Tr. 29: 17-24.) *Page 11 
The Trustees are actively involved with the Company, and have been throughout their careers. (Tr. 29: 9-16.) They were hired by the Company as full-time employees in 1975 and 1976. Their initial job responsibilities were to (a) become knowledgeable about and prepared to lead CMD and (b) purchase a small operating company that would fit into the amalgam of existing operating companies held by the Company. (Tr. 17: 15-25.)
Currently, fifteen beneficiary family members are employed in part-time positions with the Company. (Tr. 28: 23-25 and 29: 1-4). These beneficiaries serve on the Investment Advisory Panel (Tr. 30: 2-7) and some also serve on the Liquidation Advisory Panel (Tr. 32: 14-25) or on the board of directors of the Company. (Tr. 34: 5-14). The Investment Advisory Panel is only advisory and meets four times a year. (Tr. 30: 23-25). The Liquidation Advisory Panel is not permanent and is also only advisory. (Tr. 34: 15-23).
Although there is nothing in the Trust instrument that directs the Trustees to ensure that family members actively participate in the Company, there is a dispute among the beneficiaries and the Trustees as to what extent the Trustees have an obligation to provide opportunities to beneficiaries. (Tr. 36: 12-19.) Furthermore, certain beneficiaries have challenged the fairness of the fact that only the Trustees hold executive positions with the Company. (Tr. 36: 20-23.) The Trust authorizes and encourages family members, even if they are Trustees, to hold positions as executives with the Company. Although the Trustees have been aware of the desire of other beneficiaries to hold full-time higher-level positions with the Company that would allow them more active participation, such positions have not existed. Mr. Wood Prince testified that the Trustees have felt as if they are in a "Catch-22" situation because anything they might *Page 12 
have done to address this issue (even if it were nothing) was likely to result in litigation. (Tr. 38: 7-14.)
The death of William H. Wood Prince, the last person who was a named measuring life in the Trust, established a termination date for the Trust in 2019. One of the goals of the Trustees in their investment strategies was to preserve Trust principal in anticipation of the 2019 termination date. Mr. Wood Prince testified that the Trustees' efforts to employ prudent investment strategies for the benefit of all of the beneficiaries had the effect of curbing employment opportunities available for beneficiaries. (Tr. 37: 10-16.) The Trustees considered buying one or more operating companies to provide employment opportunities, but believed that the risks involved to the Trust in purchasing operating companies of sufficient size to provide the desired employment to beneficiaries would not have been prudent investments and would have been challenged by some of the beneficiaries. (Tr. 37: 19-22 and 38: 5-10.)
2. Employment-Related Gender Distinctions
Disputes regarding employment issues are further complicated by disputes regarding the validity and enforceability of provisions of the Trust that provide benefits to males, but not to females, who are employed by the Company. (TML 12-13.) Even if all beneficiaries could be actively employed with the Company, there likely would still be disputes regarding the employment-based benefits under the Trust that could lead to litigation because the Trust does not provide these benefits to women. (Tr. 39: 5-10.)
Male beneficiaries serving the Company on the Investment Advisory Panel and the Liquidation Advisory Panel receive distributions of income from paragraph (j)(II) of the Trust. (Tr. 31: 14-20 and Tr. 33: 1-7.) Female beneficiaries are employed by both of *Page 13 
these panels but do not share in the benefits under paragraph (j)(II)of the Trust. (Tr. 33: 8-13.) Under the Trust, female beneficiaries are not eligible to receive payments from the Discretionary Half at termination; this benefit is limited to certain males working for the Company. (Tr. 33: 14-21.)
There is a dispute among the parties regarding the employment-related gender distinctions in the Trust that grant beneficial interests to males, but not to females, who are serving the Company as directors, officers or employees. Certain Adult Beneficiaries have filed a counterclaim in the Accounting Litigation contesting these employment-related gender distinctions affecting distributions of Trust principal. They argue that these provisions of the Trust must be construed to benefit males and females equally, because they otherwise violate public policy and the law as a result of changed circumstances and changes in the law since the establishment of the Trust in 1932 not anticipated by the Settlor; including, (i) the employment by the Company of female members of the Settlor's family and (ii) the enactment of federal and state antidiscrimination laws and the development of the law under the equal protection clauses of the United States Constitution and the Constitution of the State of Rhode Island. Other Adult Beneficiaries dispute the claims described above and challenge the women's right to participate in discretionary distributions of Trust principal.
3. Continuation of Disputes
If the settlement is not successful, the Accounting Litigation will proceed, but even a resolution of the issues in the Accounting Litigation will not resolve all of the issues in dispute or avoid new or continued litigation of other issues. (Tr. 57: 16-24.) Many of these claims involve issues related to the construction of the Trust that will exist *Page 14 
or reappear, depending upon the identity and circumstances of the beneficiaries, until well beyond the natural termination of the Trust in 2019. (Tr. 59: 14-25 and 60: 1-13; TML 2; Supplemental Memorandum of Trustees in Support of the Petition for Court Approval of the Prince Family Settlement Agreement (TSML) 2-3; and ABM 8-9.)
If litigation continues or ensues in the future, it is expected that the parties would attempt to reach another settlement; however, considering the time it has taken to reach the current settlement, the increasing number of beneficiaries and lawyers, the number and complexity of the potential issues involved, and the arguments that are likely to result from the reinvestment of the Trust assets, any future attempts at a settlement are likely to be even more costly, difficult and time consuming. (Tr. 58: 20-25 and 59: 1-8.) Professional fees and costs related to the Settlement Agreement have been considerable and can be expected to continue and increase exponentially if the Parties do not achieve a settlement.[4] The Trustees and the Adult Beneficiaries fear that the significant amount of money already spent by the Trust would only be a fraction of the legal fees and costs of the potential future litigation. (Tr. 58: 11-19.)
B. Terms of the Settlement Agreement 1. Termination of the Trust
The Settlement Agreement calls for early termination of the Trust. (Tr. 44: 24-25 and Tr. 45: 1-2.)
2. Distributions under the Settlement Agreement
Other than certain limited exceptions in settlement of special claims, the Settlement Agreement provides that distributions pursuant to early termination will be *Page 15 
made in accordance with the Trust's terms, taking into account the earlier date for termination. (TML 37.)
a. Income Interests under Article II, Section I of the Trust
Each beneficiary is to receive the actuarially-calculated present value of his or her right or potential right to the income payments under Article II, Section 1 of the Trust. (TML 41.)
b. Non-Discretionary Half
Each beneficiary is to receive the actuarially-calculated present value of his or her right or potential to the principal of the Non-Discretionary Half of the Trust. (TML 41-42.)
c. Discretionary Half
The Discretionary Half will be distributed to beneficiaries currently employed by the Company as provided in the Settlement Agreement, and to beneficiaries potentially employable by the Company in 2019, as provided in the Addendum (discussed below). This allocation reflects the negotiated agreement of the Parties, taking into account factors such as each beneficiary's age, gender, and life expectancy, the degree of each beneficiary's current involvement with and past contributions to the Company, potential future service to the Company, a potential future role for the beneficiary as a Successor Trustee, and the potential loss of future employment opportunities with the Company. (TML 42.) It should be noted that early termination of the Trust will likely deprive the younger generation of opportunities to prove themselves in the Prince family enterprise and thus deprive them of a more substantial portion of the discretionary share. These contentions — although vigorously disputed by other beneficiaries and the Trustees — *Page 16 
might well be deemed to have merit if this action were tried to a conclusion, thus justifying substantial payments to the younger generation under the Settlement Agreement. Finally, women are also included in this allocation in recognition of their potential claims regarding the validity of the gender-related employment provisions of the Trust. (TML 25.) These distribution amounts were reached through arms-length negotiations. (TSML 19.)
The Trustees believe that this allocation reflects what might be a reasonable exercise of their discretion. (Settlement Agreement 27.) In any event, under Rhode Island law the Court would have to make or at least approve the final distributive plan for the Discretionary Half because the Trustees are members of the group that is eligible for discretionary distributions from the Discretionary Half at termination of the Trust. Armington v. Meyer, 236 A.2d 450 (R.I. 1967).
d. Settlement Payments
Under the Settlement Agreement, certain beneficiaries receive payments in settlement of their claims regarding the executive bonuses paid to the Trustees. These beneficiaries had alleged that the Trustees' bonuses (which had been declared but not paid pending the resolution of the dispute) were excessive and had reduced the amount of Trust principal that would be available to them upon termination. (Settlement Agreement 23-24.)
Josefa Prince will receive a payment under the Settlement Agreement (in addition to the actuarial value of her rights under the Trust) in settlement of her asserted claims. She objected to termination of the Trust if it would result in a distribution to her of an actuarially-calculated amount that was considerably less than what she would otherwise *Page 17 
be entitled if the Trust terminated strictly according to its terms.[5] One of Josefa Prince's claims was that the actuarial value of her rights under the Trust did not fairly or accurately represent the actual value of her interest. She claimed that her situation is unique because she was specifically named in the Trust (as the widow of Frederick H. Prince III), indicating the Settlor's intent to benefit her specifically as he had provided. Furthermore, unlike the situation of the other beneficiaries, where a discount of the amount to which they might be entitled would result in a distribution to their descendants, if any, any discount of Josefa Prince's rightful amounts would not be distributable to her descendants because the Trust provides that her rights only exist if she is alive at termination, and does not provide for her descendants. Accordingly, Josefa Prince argued that to reduce her share would be in contravention of the Settlor's intent (unlike the others, where the discount would only result in allocation among descendents of the respective beneficiaries, if any).[6] Further, Josefa Prince argued that she is in good health and does not believe the actuarial calculations accurately reflect the likelihood of her survival until 2019. Josefa Prince would not agree to termination of the Trust under the Settlement Agreement unless her unique situation was addressed. (Tr. 73: 21-25 and 74: 1; 21-25.)
Frederick H. Prince IV will receive a payment under the Settlement Agreement (in addition to the actuarial value of his rights under the Trust and the originally-negotiated amount of his payment under the Discretionary Half) in settlement of his asserted claims. In arms-length negotiations with the Elizabeth Prince family regarding the allocation of amounts under the Discretionary Half, Frederick H. Prince IV claimed *Page 18 
that he should be entitled to this additional amount based upon the nature and extent of his years of service to the Company as compared to the nature and extent of the contributions of the Elizabeth Prince family. The Elizabeth Prince family disagreed and argued that their respective rights to portions of the Discretionary Half should reflect lost opportunities and potential for contribution to the Company that the Trustees should have provided and would have an obligation to provide in the future. An impasse was reached in this negotiation. To resolve the impasse, the Wood Prince Adult Beneficiaries agreed to fund this settlement payment. The source of the settlement payment, which is intended to be an adjustment to the Discretionary Half, comes from amounts that would otherwise be payable to the Wood Prince beneficiaries as a result of the actuarially-calculated discount to Josefa Prince's share. This reallocation was made pursuant to arms-length negotiations by the Wood Prince and Fred Prince families and their counsel. (TML at 44.)
3. Charitable Aspects of Settlement Agreement
Under the Settlement Agreement, the Trustees are required to distribute twenty-five percent (25%) of the Non-Discretionary Half to charities upon termination of the Trust. The Settlement Agreement requires the Trustees to distribute one-third (1/3) of this amount to charities as directed by the Elizabeth Prince Family.[7] (Settlement Agreement 31-32.)
The Trustees are also trustees of a charitable trust created by the Will of Frederick H. Prince, dated June 22, 1948 (the Testamentary Trust) that is separate from the Trust but is also involved in the pending family disputes. The Settlement Agreement includes *Page 19 
provisions to settle these disputes and requires the Trustees, in their capacities as trustees of the Testamentary Trust, to petition the Court separately for authority to sever a portion of the Testamentary Trust and distribute it to a new charitable trust, effectively transferring the management and control of a portion of the Testamentary Trust to the Elizabeth Prince Family. This Petition for Authority to Establish and Fund Elizabeth Prince Family Charitable Trusts (the Petition to Sever) was filed on October 10, 2007 and is currently pending as C. A. No. 2007-5447.
In the Petition to Sever, the Trustees seek authority to sever funds from the Testamentary Trust, which funds would be used to establish four new Rhode Island charitable trusts to be managed and controlled by the four adult members of the Elizabeth Prince Family. (Petition to Sever 1.) A Supplement to the Petition to Sever was filed on April 8, 2008 to reflect certain changes to the four new charitable trusts that were requested by the Rhode Island Attorney General's Office. (Supplement to Petition for Authority to Establish and Fund Elizabeth Prince Family Charitable Trusts 1-2.) Adam Sholes, counsel with the Rhode Island Attorney General's Office, testified at the April 9th
hearing that the Rhode Island Attorney General sees no adverse effect to the charitable interests from this transaction. (Tr. 105: 20-23.) The Court in the immediate future will issue its order authorizing the severance of funds from the Testamentary Trust; authorizing and directing the establishment of four new Rhode Island charitable trusts consistent with the provisions contained in said petition and reflecting the changes requested by the Attorney General as set forth in the Supplement to said petition. *Page 20 
 4. Private Letter Ruling Request
The Settlement Agreement requires the Trustees to apply to the Internal Revenue Service for a private letter ruling regarding the tax effect of the Settlement Agreement, if any. (Settlement Agreement 17-18.) In certain circumstances specifically related to the response of the Internal Revenue Service to the private letter ruling request outlined in the Settlement Agreement, the parties have the right to nullify the Settlement Agreement. (Settlement Agreement 21.) The Settlement Agreement provides that if it is nullified pursuant to its terms, the parties have reserved the right to continue the Accounting Litigation and assert other claims the Settlement Agreement resolves. (TML 39.)
C. The GALs and the Addendum
The GALs were consulted about the settlement discussions near the beginning of the settlement process and agreed to entertain the idea of early termination of the Trust provided that there was an adequate quid pro quo for their wards. (Tr. 83: 4-12.) The GALs received copies of the Settlement Agreement for review and evaluation. Each GAL was charged with the duty of evaluating the terms of the Settlement Agreement and reporting to this Court regarding his or her opinion as to whether the Court should approve the Settlement Agreement on behalf of his or her ward. (TSML 11-12; Adult Beneficiaries' Memorandum in Support of Trustees' Petition for Court Approval of the Prince Family Settlement Agreement (ABM) 14.) The GALs considered the terms of the Settlement Agreement over a period of months and discussed various concerns with counsel for the Adult Beneficiaries. (TSML 12; see also ABM 7; 16-32.) *Page 21 
 1. The Addendum
In response to concerns raised by certain GALs regarding the adequacy of protections for their respective wards under the Settlement Agreement, the Adult Beneficiaries executed an Addendum to the Settlement Agreement that includes certain additional protections for the minor, unborn and unascertained beneficiaries.
First, the Addendum provides that certain adjustments will be made to the allocation of the Discretionary Half in the Settlement Agreement in order to provide certain amounts to minor beneficiaries who would be of legal employment age upon the Trust's natural termination date in 2019. Secondly, the Trustees have published notice that a Petition has been filed in Rhode Island Superior Court for Court Approval of the Settlement Agreement in the same jurisdictions in which the New England Research Associates investigated in 2006 for unknown and unascertained descendants on behalf of the GAL for unborn and unascertained beneficiaries. Thirdly, each Adult Beneficiary has signed an Affidavit of Family Composition affirming that he or she does not know of any undisclosed beneficiary. Additionally, each Adult Beneficiary has also signed an Unborn and Unascertained Beneficiary Agreement with the Trustees to provide for his or her respective future born or ascertained children. Finally, the Addendum provides that the provisions set forth in Section 9 of the Settlement Agreement regarding the distribution of the actuarially-calculated present interests under Article II, Section 1, paragraph (j)(I) will be modified so that as of the Termination Date, the Trust will purchase an annuity to pay the annual distributions under that clause to existing and future Article II, Section 1, paragraph (j)(I) beneficiaries from the Termination Date through January 22, 2019. (Addendum to the Settlement Agreement 3-5.) *Page 22 
Each of the GALs filed a report with this Court. There were no objections to the Settlement Agreement, and in all but two cases, the GALs unequivocally recommended that the Court approve the Settlement Agreement and early termination of the Trust. (TSML 13.) Two of the GALs have referred certain specific interests of their wards to the Court for its consideration. Id.
 2. Issues Submitted to the Court by the GAL for Isabella Helen Kikerand Oliver Werner Kiker
The GAL for Isabella Helen Kiker (Isabella) and Oliver Werner Kiker (Oliver) (the Kiker GAL) represented to this Court that she favored the concept of early termination and recommended approval of the Settlement Agreement as to all of her wards' interests except the valuation of both her wards' interests under the Discretionary Half and Oliver's interest under Article II, Section 1, paragraph (j)(II) of the Trust.See Report of the GAL for Isabella and Oliver Kiker, at 37. The Kiker GAL submitted these interests "to the care and protection of the Court."Id.
Isabella and Oliver are currently ages 8 and 3, respectively. If the Trust were to terminate in 2019, they would then be 19 and 14, respectively. (ABM 19.) The Kiker GAL asserted that because Isabella and Oliver would be of legal employment age when the Trust terminated naturally in 2019, they would have claims that (1) they should be employed by the Company and (2) as employees of the Company, they should receive a share of the Discretionary Half.[8]
In the Addendum to the Settlement Agreement, the Adult Beneficiaries and Trustees agreed to settle each of the Kiker wards' employment claims for a fixed sum, which payment is intended to compensate them for their asserted interests in the *Page 23 
Discretionary Half and for Oliver's asserted interest in distributions under Article II, Section 1, paragraph (j)(II).[9] The Kiker GAL has submitted to the Court the question of whether those proposed settlement payments are sufficient to support the Kiker wards' consent to the proposed termination. The specific question presented is whether those payments represent a fair and adequate settlement of the Kiker wards' claims that they would have a right to employment and payments from the Discretionary Half in 2019. Id. at 36.
3. Issues Submitted to the Court by the GAL for the Unborn andUnascertained Beneficiaries
The GAL for the unborn and unascertained beneficiaries recommended approval of the Settlement Agreement on behalf of the unborn beneficiaries; however, she declined to recommend such approval on behalf of the unascertained beneficiaries (other than unborn beneficiaries), and deferred to the Court on this issue. As set forth in her report, this GAL noted that while the potential existence of any such unascertained beneficiary is extremely remote, it is impossible to determine whether the Settlement Agreement is in such beneficiary's best interests without knowledge that any such beneficiary exists. Although she deferred to the Court on this issue, she stated at the hearing on April 9, 2008 that she believes that the Adult Beneficiaries did a great deal of work to accommodate the interests of the wards of the GALs and that the Settlement Agreement represents the best possible result for their interests. (Tr. 83: 13-22.) She also expressed her opinion that under the balancing test of Section 65 of the Third Restatement, the reasons for early termination are so strong, and the interests of the limited class of *Page 24 
unascertained beneficiaries are so remote, that the Court has a great deal of latitude to make a decision regarding early termination by beneficiary consent. (Tr. 85: 15-22.)
 III Conclusions of Law A. Termination by Consent of the Beneficiaries
Section 65 of the Restatement (Third) of Trusts (the Third Restatement), addresses trust termination by consent of the beneficiaries. It provides:
 "(1) Except as stated in Subsection (2), if all of the beneficiaries of an irrevocable trust consent, they can compel the termination or modification of the trust.
 (2) If termination or modification of the trust under Subsection (1) would be inconsistent with a material purpose of the trust, the beneficiaries cannot compel its termination or modification except with the consent of the settler or, after the settlor's death, with the authorization of the court if it determines that the reason(s) for termination or modification outweigh the material purpose." Restatement (Third) Trusts § 65 (2003).
Under the Third Restatement, it is not necessary that all beneficiaries be sui juris in order for there to be the requisite consent. It is sufficient if all beneficiaries not sui juris are represented by court-appointed guardians ad litem. See Restatement (Third)Trusts, § 65, reporter's notes on comments b and c (2003).[10]
 1. Judicial Findings and Conclusions of Law Regarding the IssuesSubmitted to the Court by the Kiker GAL
This Court has reviewed the issues submitted for its consideration by the Kiker GAL and concludes that the interests of Isabella and Oliver are fully and adequately protected under the Settlement Agreement and Addendum. Accordingly, the Kiker GAL, who consented to all aspects of the Settlement Agreement and Addendum subject only to *Page 25 
this Court's findings, shall be deemed to have consented to the Settlement Agreement and Addendum. The basis for this conclusion follows.
The legal and factual obstacles to the successful litigation of the Kiker wards' asserted claims are substantial, and they have little likelihood of success. Any interest Isabella and Oliver might have in 2019 to a portion of the Discretionary Half would first be based on their potential claims to employment by the Company. (Trust Article III, Section 3.) The Court must determine whether Isabella and Oliver have any bona fide claims to employment and, if so, whether they would have an enforceable claim to a distribution from the Discretionary Half at termination.
Although the Trust language encourages the Trustees, as sole shareholders of the Company, to cause the Company to employ certain male beneficiaries, the Trustees are not directed to do so and employment with the Company is discretionary. Likewise, upon termination of the Trust, the Discretionary Half is distributable in the sole discretion of the Trustees among males who are then serving the Company as officers, directors or employees. (ABM 19.)
Under Rhode Island law, in a discretionary trust, "the trust assets are not the property of its beneficiaries," In Re Gordon, 2000 R.I. Super. LEXIS 16 at *13-14, and the trustees "are the sole judges of the propriety of applications for funds," See Chenot v. Bordeleau,561 A.2d 891, 894 (R.I. 1989). When a trust grants absolute discretion to a trustee to make discretionary distribution decisions, a trustee does not abuse his discretion unless his decision is "arbitrary and capricious in light of [his] responsibilities to all potential beneficiaries."See Mahoney v. Board of Trustees, 973 F.2d. 968, 970 (1st Cir. 1992). As long as the trustees "act in good faith, their exercise of the discretion *Page 26 
or refusal to exercise it cannot be controlled by the Court." See Stonev. Westcott, 18
R.I. 685, 687 (1894). Therefore, to establish any enforceable rights to payments under the Discretionary Half, the Kiker wards would have to establish (1) that the Trustees through a reasonable exercise of their discretion could not refuse to employ the Kiker wards and (2) that if the Kiker wards were employed in 2019 (at ages 14 and 19), the then-acting Trustees through a reasonable exercise of their discretion could not exclude the Kiker wards from a distribution from the Discretionary Half. (ABM at 19-20.)
a. Trust Language and Family Settlement Agreements
The language of the Trust discloses the Settlor's purpose in providing payments for beneficiaries who are employed with the Company. In Article II, Section 1, the Settlor stated:
 "[b]elieving as I do that the expectation of substantial reward stimulates the best service, and it being my hope that Frederick Henry Prince, III, Bernard Henry-Wood, III, and William Henry-Wood, and/or their male children and/or more remote issue, will become actively identified with and work for the success of the corporation which bears my name, I request the Trustees, so far as they are able, to cause the corporation to adopt a liberal policy in remunerating the services of such of the above-described persons as enter its services while such service continues." Trust, Article II, Section I.
In Article II, Section 1 of the Trust, the Settlor also stated his hope that his male descendants would be employed "if and so long as they are proficient and diligent." Furthermore, the Settlor himself stated his hope that his grandson, Frederick Henry Prince, III, would be employed "after he attains the age of twenty-five years." Id. In a 1959 Family Settlement Agreement approved by this Court in Prince v. WoodPrince, *Page 27 
No. 27723, the Trustees specified that Frederick H. Prince IV could not commence his employment before reaching the age of 21.
b. Previous Court Findings
This Court previously has recognized that distributions from the Discretionary Half were intended by the Settlor to go to "family members who had participated in and were contributing to the health and vigor of the Prince enterprise." Wood Prince v. Michaelson, C.A. 75-2456 (Jan. 8, 1976). This Court has also previously expressed skepticism that the Trustees would have any obligation to exercise their business judgment "in order to provide a possible place of employment for a present five or six year old beneficiary who at the time of natural termination of the Trust would be 19 years of age." See Wood Prince v. Lynch, 2005 R.I. Super. LEXIS 24, at *28 (R.I.Super.Ct. Feb. 8, 2005). Although the Kiker GAL has pointed out that the legal age for employment in Rhode Island is fourteen, denial of employment to teenagers could be considered a reasonable exercise of business judgment by the Trustees if such a decision were made for business purposes, with the protection of the Company and the Trust in mind.
c. Beneficiary Positions
Many of the beneficiaries have expressed their view that the Settlor would not have intended to provide jobs to children solely for the purpose of entitling them to benefits under the Trust. (ABM 21.) At least one beneficiary objects to the employment of teenaged beneficiaries. Diana Oehrli, the mother of Isabella and Oliver, opposes her children receiving any distribution from the Discretionary Half.[11] She has informed the *Page 28 
Kiker GAL that she would not permit her children, who live in Switzerland, to be employed by the Company in the United States while they are minors. Id.
 d. Company Practice and Business Judgment
There has never been a case in which a beneficiary has been employed by the Company before reaching the age of 21. (Tr. 37: 4-14.) The Court finds it unlikely that the Kiker wards could succeed on a claim to establish enforceable rights either to employment with the Company or to a payment under the Discretionary Half (and in Oliver's case, under Article II, Section 1, paragraph (j)(II)). A decision by the Trustees not to hire the Kiker wards and/or not to make a distribution to the Kiker wards at Trust termination would be discretionary, and would not be disturbed by the Court absent a finding that the Trustees had abused their discretion. Generally, discretionary decisions of trustees that are made in good faith and are not arbitrary or capricious do not constitute an abuse of discretion under Rhode Island law. See Mahoney v.Board of Trustees, 973 F.2d 968, 970 (1st Cir. 1992); Cleary v. GraphicCommunications Int'l Union Supplemental Retirement and DisabilityFund, 841 F.2d 444, 449 (1st Cir. 1988).
The Court finds that the payments proposed to the Kiker wards are fair and within the range of reasonable outcomes if the Kiker wards' employment claims were to be litigated.[12] The settlement payments are a reasonable compromise by the Adult Beneficiaries and Trustees to avoid the cost to the Trust of litigating the claims. The amount of the payments is consistent with the settlement values assigned in the Addendum to the other minor wards. See Addendum at Schedule A. The reasonableness of the figures is supported by the fact that all of the GALs for the minor wards who would be of legal employment age in 2019, other than the Kiker GAL, have approved the *Page 29 
settlement values proposed in the Addendum. (ABM at 24; see also Reports of the GALs for Jacques Henry de Ramel, Charles Norman Prince de Ramel, Catherine Estelle Collins and Eleanor Jane Sherman, Andrew Edward Steinwold, Nell July and Pearl Dryden Wood-Prince, and William Henry Wood-Prince.)
Although the proposed payments to the Kiker wards are less than amounts going to members of the fifth generation of beneficiaries from the Discretionary Half pursuant to the Settlement Agreement, the difference reasonably reflects the fact that the members of the fifth generation are all over twenty-one (21) years of age and currently employed by the Company. They do not face the substantial possibility, as the Kiker wards do, that they would never be eligible for employment prior to 2019.
The fact that the two Kiker wards are to receive the same amount notwithstanding their difference in age also is appropriate. Although Isabella will be nineteen in 2019, the value of her claim is diminished by the fact that she is female. In order for her to have a claim to any payment under the Discretionary Half, she would have to succeed in overcoming the Trust language directing such payments only tomale descendents of the Settlor. Accordingly, it is not unfair or unreasonable that she would receive the same amount to settle her employment claim as her younger brother.
The Court finds that the payments to the Kiker wards proposed in the Addendum represent a fair and reasonable approximation of the value of those wards' potential claims to share in the Discretionary Half of the Trust at termination and of Oliver's potential claim to share in distributions under Article II, Section 1, paragraph (j)(II). Accordingly, no basis exists to reject the proposed settlement on behalf of those wards. *Page 30 
 2. Judicial Findings and Conclusions of Law Regarding the IssuesSubmitted to the Court by the GAL for the Unborn and UnascertainedBeneficiaries
The GAL for the unborn and unascertained beneficiaries has recommended that the Court approve the Settlement Agreement on behalf of the unborn beneficiaries of the Trust, but has declined to recommend consent on behalf of any beneficiaries who may be in existence but are not ascertained. The GAL for the unascertained beneficiaries deferred to the Court the issue of whether the Settlement Agreement and Addendum are in the best interests of her unascertained wards. She explained that she could not consent on their behalf when doubt exists as to whether the Settlement Agreement and Addendum are in their best interests, as their circumstances "cannot be predicted with any certainty." See Report of the GAL for the Unborn and Unascertained Beneficiaries of the Frederick Henry Prince Trust, at 52. As any such unascertained beneficiaries cannot be identified, it is impossible to value their interests and to determine whether the Settlement Agreement is in their best interests.
The Official Comments to Section 65 state, in relevant part:
 "Also included among those whose consent is required are successors in interest of prior beneficiaries, and the potential unborn (including after-adopted) or unascertainable beneficiaries so often provided for by class description, as in a seemingly simple trust designed to pay income to A for life and then to distribute the principal to A's descendants who are living at her death." Restatement (Third) Trusts, § 65, general comment b (emphasis added) (2003).
Significantly, the comment refers only to unascertainable beneficiaries — not to living, unascertained beneficiaries. The comment explains that unascertainable beneficiaries are the type of beneficiaries often provided for by class description, such as where a will or trust includes a provision in favor of a person's heirs. The heirs of a living person, by *Page 31 
definition, cannot be ascertained during the life of that person. As such, those beneficiaries are "unascertainable."
The unborn or future adopted beneficiaries are the unascertainable beneficiaries described in the Third Restatement, because their existence and the extent of their rights cannot be ascertained until the actual Termination Date occurs. The unascertainable have been taken into account under the Addendum. If any such beneficiaries exist upon the Termination Date, they will receive an actuarially-calculated amount in satisfaction of their potential rights under the Trust. The Addendum provides that if any such unascertainable beneficiaries are born or adopted to any of the Adult Beneficiaries, they will be provided for by their parents pursuant to a formula under the Addendum. In contrast to the "unascertainable beneficiaries" described in the Third Restatement comment, the "unascertained beneficiaries" represented by the GAL for the unborn and unascertained beneficiaries, if any, exist and although they are unknown, are capable of being ascertained. The GAL for the unascertainable (unborn or future adopted) beneficiaries has recommended consent to the Settlement Agreement.
The GAL for the unascertained beneficiaries has diligently attempted to locate and identify all unknown existing beneficiaries. (Report of the Guardian for the Unborn and Unascertained Beneficiaries of the Frederick Henry Prince Trust 21.) No additional living beneficiaries have been identified as a result of her efforts. Id. at 49. The interests of unascertained living beneficiaries in this case, if any, are extremely remote, impossible to quantify and cannot reasonably be protected beyond what is provided in the Settlement Agreement. (ABM 31; Report of the Guardian for the Unborn and Unascertained Beneficiaries of the Frederick Henry Prince Trust 48-49.) *Page 32 
Section 65 of the Third Restatement requires the consent of unascertainable beneficiaries, defined in comment b as unborn or future adopted beneficiaries. Significantly, Section 65 does not require the consent of existing but unascertained beneficiaries, such as potential illegitimate but unknown descendants of the Settlor or of any of his descendants. While this Court believes that reasonable efforts should be made by the Trustees to ascertain the existence of such potential beneficiaries, as would be the case upon the natural termination of the Trust, this Court finds that such reasonable efforts have been made in good faith by the Trustees and the GAL for the unascertained beneficiaries and, as no such beneficiaries have been identified, the consent of such beneficiaries is neither possible nor necessary to termination of the Trust under Section 65 of the Third Restatement.
The Court also recognizes that most of the issues facing the Court now regarding the potential living unascertained beneficiaries are the same as those that will exist at the natural termination date of the Trust in 2019. (ABM 28.) This Trust will terminate pursuant to Rhode Island law whether it terminates naturally, by the unanimous consent of the beneficiaries, or by this Court pursuant to the principals of equitable deviation. In any case, it will never be possible to determine with perfect certainty that no unascertained beneficiaries exist. The remote possibility that one or more beneficiaries exist but are not ascertained would not prevent the natural termination of the Trust under Rhode Island law in 2019, and it should not prevent the termination of the Trust by consent or equitable deviation pursuant to Rhode Island law any more than it would prevent natural termination in 2019. For this reason, only the consent of the GAL for the unascertainable (unborn and future adopted) beneficiaries is required. *Page 33 
 3. Consent of Beneficiaries
By executing the Settlement Agreement, all of the Adult Beneficiaries of the Trust have consented to early termination. (Settlement Agreement 16.) In addition, the Attorney General for the State of Rhode Island has no objection to early termination of the Trust pursuant to the Settlement Agreement to the extent it affects the charitable provisions of the Trust. (Tr. 106: 6-17.) Finally, the Court is satisfied with the GALs' reports regarding the benefits of the Settlement Agreement and Addendum to their wards and recommending Court approval of the Settlement Agreement. The GAL for the Kiker wards, who consented to all aspects of the Settlement Agreement and Addendum subject to this Court's findings regarding certain issues, is deemed to have consented to the Settlement Agreement and Addendum as a result of this Court's finding that the Settlement Agreement fully and adequately protects the interests of Oliver and Isabella that were submitted to this Court for review. The Court finds that the recommendation for approval that was submitted to this Court by the GAL for the unascertainable (unborn and future adopted) beneficiaries satisfies the requirements of Section 65 of the Third Restatement and that consent on behalf of the remote class of potential beneficiaries who may exist but are unascertained is not required under Section 65 of the Third Restatement for termination of the Trust by consent.
4. Trust Purposes
The Trust's purposes have been identified previously by the Rhode Island Supreme Court and this Court as follows: (1) to avoid unnecessary tax liability; (2) to provide for the support and maintenance, including the provision of income benefits, to the Settlor's family lines; (3) to perpetuate the Settlor's economic enterprise in the Prince *Page 34 
and Wood families; and (4) to create a substantial corpus that might be distributed, in large part, to those family members who had participated in and who were contributing to the health and vigor of the Prince enterprise. See Prince v. Roberts, 436 A.2d 1078, 1082 (R.I. 1981);Prince v. Nugent, 172 A.2d 743, 747-48 (R.I. 1961); Wood Prince v.Michaelson, C.A. 75-2456 (Jan. 8, 1976). This Court also has recognized a possible fifth purpose — to provide employment for male beneficiaries.Wood Prince v. Lynch, 2006 R.I. Super. LEXIS 36 at *9-10 (R.I.Super.Ct. April 20, 2006). In their Memorandum, the Trustees suggest that the Trust's spendthrift provision may be a further purpose of the Trust, although never identified as such by this Court.
In this case, the Adult Beneficiaries disagree about whether the Trust's material purposes are capable of being fulfilled through continuation of the Trust. Certain Adult Beneficiaries believe, for example, that the Prince corporate complex has changed so dramatically over the years that it no longer can provide opportunities for the male beneficiaries (much less the female beneficiaries) to participate in and contribute to its "health and vigor." See Counterclaim of Alain Wood-Prince, Edward Alexander Wood Prince, and Edward Alain Wood-Prince, filed Sept. 9, 2005. Others, while agreeing that the complex has changed, dispute that the Trust's employment and participation purposes are impossible of performance. Those beneficiaries believe that the Trust can fulfill the Trust's purposes. See Cynthia Elizabeth Prince's Reply to Counterclaim of Alain Wood-Prince, Edward Alexander Wood Prince, and Edward Alain Wood-Prince, filed April 5, 2007.
The Adult Beneficiaries acknowledge this difference of opinion. It is one of the Disputed Issues identified in the Settlement Agreement. The parties are not seeking a *Page 35 
ruling from this Court on any of the Disputed Issues, and they have not presented evidence upon which this Court could decide those issues. Rather, the parties are seeking approval of the Settlement Agreement that will eliminate the need to litigate those issues. In light of the dispute regarding the possibility of performance of the Trust's purposes, the Court will assume for purposes of its analysis that some Trust purposes can still be achieved and must therefore determine whether the objectives underlying those purposes are outweighed by the reasons supporting termination.
5. Factors Supporting Termination
Substantial factors weigh in favor of early termination of this Trust. Based on the undisputed evidence presented by the Trustees and Adult Beneficiaries, it is clear that if the Trust is not terminated pursuant to the Settlement Agreement, the existing litigation, which was stayed by the parties in order to pursue settlement, would resume, and it is expected that further issues would arise over the remaining years of the Trust, at its termination and beyond. Termination now pursuant to the Settlement Agreement would resolve all current litigation and eliminate anticipated future Trust litigation.
The Trustees and Adult Beneficiaries have presented evidence that the longstanding Trust-related disputes have not only cost the Trust a substantial amount in professional fees, but have also strained and alienated relationships within the family.[13] (Tr. 10: 18-25 and 11: 1-2.) Early termination by consent will avoid further depletion of Trust assets by the costs of litigation. (Tr. 9: 20-25 and 10: 1-2.) Also, once the source of their contention (the Trust) is eliminated, the beneficiaries may be able to heal and restore their family bonds, which have been damaged by contentious Trust-related disputes. (AMB 14.) *Page 36 
The pending and anticipated litigation is by itself contrary to the Settlor's intent. The costs involved to the Trust and the beneficiaries have been devastating, and the distraction of litigation interferes with the administration of both the Trust and the Company through no fault of the Trustees or the beneficiaries. These are significant and compelling factors that weigh decidedly in favor of early termination of this Trust. The Court, however, must weigh these factors against the potential continuation of one or more material purposes of the Trust.
6. Balancing Test
The Trust's tax avoidance purpose is not compromised by early termination of the Trust. The Trust was created before the enactment of the federal estate, gift and generation-skipping transfer tax ("GST Tax"). Because of the effective date of the Trust, it is a "GST Tax Exempt" Trust and it has existed and grown for generations without incurring estate or gift taxes. Termination pursuant to the Settlement Agreement will not defeat the Settlor's tax planning objectives. The estate tax benefits of the Settlor's tax planning have already been substantially realized. Had the date of death of the last of the measuring lives under the Trust been earlier, which the Settlor could have anticipated was possible, this Trust might have terminated already. The GST Tax Exempt status of the Trust is preserved under the Settlement because the Settlement Agreement may be nullified by any party thereto if the Trustees do not receive a private letter ruling from the Internal Revenue Service confirming that termination and distribution of the Trust's assets pursuant to the Settlement Agreement will not result in a loss of the Trust's GST *Page 37 
Tax exemption.[14] Accordingly, the overriding tax benefit of the Trust is preserved in the proposed termination.
Similarly, early termination does not undermine the Trust's purpose to provide maintenance and support to its beneficiaries. The distribution plan set forth in the Settlement Agreement closely approximates the distributions that would be made if the Trust were to terminate at 2019, including distributions of the present value of future income payments from the Trust.[15] (Settlement Agreement 24-28.) On the other hand, continuation of the Trust is likely to prejudice the Settlor's maintenance and support goals. Unless the Settlement Agreement is consummated, professional fees and costs associated with continued litigation likely will consume Trust assets and reduce the amount ultimately available for distribution to the beneficiaries. (Tr. 58: 11-19.) These costs would prejudice the Settlor's maintenance and support purposes, as well as his additional purpose, as found by the Court to create a "substantial corpus" for distribution to those who contributed to the Prince economic enterprise. (Tr. 14: 19-23.)
Moreover, the Settlement Agreement and early termination of the Trust would not compromise the Settlor's employment or participation purposes. Whether those objectives can be accomplished at this point is a disputed issue. If the Trust does not terminate, certain beneficiaries intend to continue litigation over this issue. (ABM 15.) The litigation, however, will take time, and even if those beneficiaries prevail, it may be too late to provide greater opportunities prior to 2019. Id.
In terms of the possible spendthrift purpose, the Court need not determine whether the spendthrift provision is a Trust purpose. Comments to the Third Restatement *Page 38 
note that "spendthrift restrictions are not sufficient in and of themselves to establish, or to create a presumption of, a material purpose that would prevent termination by consent of all of the beneficiaries." Restatement (Third) Trusts, § 65, general comment e. Finally, the Court also recognizes that as this Trust has existed for over 75 years, it already has largely accomplished the Settlor's purposes.
7. The Court Approves Termination of the Trust by Consent of theBeneficiaries
The Court approves the termination of the Trust by the consent of the beneficiaries. Section 65 of the Third Restatement allows a trust to be terminated by consent of the beneficiaries if (1) all of the beneficiaries consent to such termination; and (2) the benefits of termination outweigh the benefits of any potential continuing purpose. This Court finds that this Settlement Agreement and Addendum meet both requirements of § 65 of the Third Restatement.
Because the Settlement Agreement and termination of the Trust have been consented to by all of the Adult Beneficiaries, and approval of the Settlement Agreement and termination of the Trust have been recommended by all GALs for the minor and unborn (unascertainable) beneficiaries, and because the obvious benefits of termination substantially outweigh the benefits of any purpose of the Trust that might potentially be accomplished by the continuation of the Trust, this Court finds that termination of the Trust is authorized under the doctrine of consent of the beneficiaries consistent with the requirements of Section 65 of the Third Restatement.
Specifically, the equitable balancing test of Section 65 of the Third Restatement conclusively favors termination now because continuation of the Trust in light of the existing and threatened litigation would undermine any of the Trust's purposes that might *Page 39 
otherwise still be possible to accomplish. Furthermore, the Court finds that if confronted with this issue, the Rhode Island Supreme Court would likely embrace the Restatement. Termination now, pursuant to the Settlement Agreement and contingent upon the receipt of the private letter ruling requested by the Trustees pursuant to Section 4 of the Settlement Agreement, will best accomplish and complete the Settlor's objectives because it preserves the tax benefit of the Trust and allocates the Trust corpus to the beneficiaries for their support and maintenance rather than to the fees and expenses of divisive litigation.
B. In the Alternative, this Court Would Have the Authority toTerminate the Trust Based on Equitable Deviation under Section 66 of theThird Restatement
Although this Court finds that termination of the Trust is authorized under the doctrine of consent of the beneficiaries, consistent with Section 65 of the Third Restatement, this Court also finds that it would have the authority to terminate the Trust, even without unanimous consent of the beneficiaries, under the doctrine of equitable deviation. As articulated in Section 66 of the Third Restatement, a court may modify a trust by equitable deviation if there has been a change in circumstances unanticipated by the Settlor and such deviation will further the purpose of the trust. (Restatement (Third) Trusts § 66 (2003)). Early termination is among the trust deviations authorized by this Restatement section. See Restatement (Third) Trusts, § 66, comment b (2003). This Court has previously acknowledged its power to terminate the Trust under the Third Restatement, even if not all of the beneficiaries consent. Wood Prince v. Lynch, et al., 2006 R.I. Super. LEXIS 36 (R.I. 2006).
Section 66 does not require the consent of all of the beneficiaries, but requires a showing of changed circumstances. It is not necessary that the situation be so serious as *Page 40 
to constitute an "emergency" or to jeopardize the accomplishment of the trust purposes. Section 66 aims to "[g]ive effect to what the Settlor's intent would have been had the circumstances in question been anticipated." Id., comment a. While the Rhode Island Supreme Court has not yet decided a case based on Section 66 of the Third Restatement, the Court has previously dealt with the core principles articulated in Section 66. Specifically, the case of Davison v. Deslauriers,288 A.2d 250 (R.I. 1972) — which dealt with the issue of early termination of a trust based on the principle of changed circumstance — is instructive on how the Court, when confronted with these issues in the past, has ruled.
In Davison, the Court considered whether to allow the trustee to pre-terminate a trust at the request of the beneficiaries. In that case, a clause in the trust authorized the trustee to terminate the trust prior to the lapse of ten years from the death of testator's wife only if certain nephews acquired a controlling interest in a particular corporation — the Bonin Spinning Company (Bonin). Davison,288 A.2d at 253. However, five years prior to the death of testator's wife Bonin's charter was forfeited and its assets distributed in liquidation, thus making it impossible for the designated nephews to acquire a controlling interest. Id. Realizing that a condition precedent to termination of the trust was no longer possible, the Court sought to ascertain what the testator would have done had he foreseen this changed circumstance.Id. at 254 The Court determined that the reason the testator had included this condition precedent delaying termination and deferring distribution of the corpus was simply to allow the designated nephews to acquire a majority interest in Bonin. Id. The Court further stated that had the testator anticipated the demise of Bonin, he would have likely directed — or at the very least *Page 41 
permitted — the trustee to terminate the trust earlier than ten years subsequent to his wife's death. Id. at 255. In conclusion, the trustee was granted permission to terminate the trust early because the Court gave effect to what the settlor's intent would have been had he anticipated the changed circumstances in question.
If a court deems termination appropriate under Section 66, "the trust property is to be distributed in accordance with the trust purposes and the Settlor's probable intention." Id., comment b. Similarly, the Uniform Trust Code Section 412, provides for the modification or termination of a trust, "[i]f, because of circumstances not anticipated by the settlor, modification or termination will further the purposes of the trust." The purpose of equitable deviation "[i]s not to disregard the Settlor's intent but to modify the inopportune details to effectuate the Settlor's broader purposes." See Comment (a) to Uniform Trust Code § 412.
Circumstances affecting the interpretation of the Trust provisions and the administration of the Trust have changed greatly since the Settlor executed the Trust in 1932. In Article III, Section 1, the Settlor stated his hope that his heirs "be . . . employed by . . . and become actively identified with and work for the success of the [Company]." In Article II, Section 1, paragraph (j)(II), the Settlor provides for distributions of income to certain male beneficiaries who are serving the Company. However, Company jobs available for beneficiaries currently are limited and, in the recent past, have consisted only of entry-level commercial real estate positions and part-time jobs related to the Trust's investments. (ABM 34.) There is no indication in the Trust that the Settlor contemplated the closing of the Stockyards or the change in the availability of beneficiary employment. Id. *Page 42 
Furthermore, changes in the law over the past seventy-five years also constitute changed circumstances that could not have been anticipated by the Settlor. A number of beneficiaries allege that the provisions of the Trust for the sole benefit of males violate public policy and federal and state employment anti-discrimination laws enacted since 1932.See TML at 12-13 and 18-20; Cynthia Elizabeth Prince's Reply to Counterclaim of Alain Wood-Prince, Edward Alexander Wood Prince, and Edward Alain Wood-Prince.
Another significant change in circumstances that could not have been anticipated by the Settlor is the proliferation of complex and extended litigation involving the Trust and its beneficiaries. The Settlor set out to create a legacy to support and benefit his descendants. Clearly he did not foresee that the Trust would engender expensive legal disputes regarding its interpretation and administration. The current litigation, and the certainty of future, ongoing litigation unless the Trust is terminated now pursuant to the Settlement Agreement, is an additional changed circumstance relevant to the Court's determination of whether to apply the doctrine of equitable deviation to pre-terminate the Trust.
The Third Restatement provides that, "[f]ailure to provide in the terms of trust for subsequent developments involved in a case reinforces an inference that the circumstances were not anticipated by the settlor." Restatement (Third) Trusts, § 66, comment b (2003). The absence of Trust terms relating to the changed circumstances in this case supports a finding that the Settlor did not anticipate such changes.
Additionally, when considering termination by equitable deviation under Section 66 of the Third Restatement, the Court would need to evaluate whether termination of the *Page 43 
Trust and a distribution of the Trust assets as contemplated in the proposed Settlement Agreement would give effect to the Settlor's intent had he anticipated the changed circumstances. Two of the identified Trust purposes (assuming a favorable private letter ruling) will be accomplished upon approval of the Settlement Agreement; namely, the support of the Settlor's family and the avoidance of tax liability.
The proposed termination and distributions pursuant to the Settlement Agreement are an appropriate response to the changed circumstances that could not have been foreseen by the Settlor, and because the terms of the Settlement Agreement are consistent with the terms of the Trust (other than certain payments in settlement of specific claims), termination under the Settlement Agreement is the option most likely to satisfy the intent of the Settlor. The proposed distribution of assets compensates each beneficiary for all of his or her interests under the Trust. The distributions to the fullest extent possible approximate what each beneficiary would receive in income through 2019 and in distributions upon the Trust's natural termination. Thus, the Settlement Agreement gives effect to the Settlor's intentions regarding the ultimate disposition of the Trust's assets.
The Settlor's tax purpose is also preserved under the Settlement Agreement. The Settlement Agreement provides that it may be nullified by any party if the Trustees do not receive a private letter ruling from the Internal Revenue Service confirming that termination and distribution of the Trust's assets pursuant to the Settlement Agreement will not result in a loss of the Trust's GST Tax exemption. The parties have also requested that any Order of this Court approving the Settlement Agreement be conditioned upon the non-occurrence of a "Negative PLR Event" and "Nullification," as defined in the Settlement Agreement. Accordingly, the overriding tax benefit of the *Page 44 
Trust is preserved in the proposed termination. Additionally, as of November 1, 2008, the Trust will have lasted seventy-six years and five months versus a maximum period of eighty-six years and seven months or approximately 90% of its normal term. Estate taxes have been avoided for three generations in one case, four generations in four cases and five generations in ten cases.
Although the Adult Beneficiaries dispute whether it is possible to accomplish the two remaining central purposes of the Trust; namely, the control and management of the Prince corporate complex and the provision of employment opportunities for beneficiaries, the ongoing litigation may prevent their accomplishment between now and the natural termination date of the Trust.
In sum, due to changed circumstances unanticipated by the Settlor, including the sale or closure of the operating companies owned by the Trust, the shift in Trust investment strategy, the reduction in employment opportunities with the Company, the growth of the Prince and Wood Prince family lines, changes in the law and society, and the proliferation of litigation regarding the Trust, which have caused great stress and disharmony among the family members and drained the Trust corpus, and the likelihood that the ongoing litigation will continue beyond 2019 without a settlement, a resolution of the large number of disputed issues and the ongoing litigation is more likely to further the Settlor's purposes than continuation of the Trust.
As a result, this Court finds that the changed circumstances in this case that were unanticipated by the Settlor would warrant equitable deviation from the Trust's termination provisions, contingent upon the non-occurrence of a "Negative PLR Event" and "Nullification." Pursuant to Section 66 of the Third Restatement, this Court would *Page 45 
have the authority to terminate the Trust even without unanimous consent of the beneficiaries (as required under Section 65 of the Third Restatement), because circumstances have changed that could not have been anticipated by the Settlor and termination is necessary (provided such termination does not cause the Trust to lose its GST Tax Exempt Status) to give effect to the Settlor's intent, and therefore, this Court orders that the Trust be terminated and the assets distributed in accordance with the terms of the Settlement Agreement, contingent upon the non-occurrence of a "Negative PLR Event" and "Nullification."
Under the Settlement Agreement, the Trustees are required to seek a private letter ruling from the Internal Revenue Service, and if this Court were to order termination under a theory of equitable deviation, it would also order that if a "Negative PLR Event" and "Nullification," occur as defined in the Settlement Agreement, termination of the Trust before its natural termination date in 2019 shall not occur and the terms of the Settlement Agreement related to termination and distribution shall be null and void; provided, however, that Sections 1, 5(f), 5(g), 7, 12(c)(i), 17(a), 17(b), 17(e), 18, 21, 22, 23, 24, 27, 29, 30, 31, 32 and 36 of the Settlement Agreement, which would survive a Nullification pursuant to Section 5(f) of the Settlement Agreement, shall have full force and effect, and that portions of the Order of this Court that relate to the surviving provisions shall also have full force and effect.
 IV Conclusion
Because this Court finds that all of the beneficiaries, including minor, unborn and unascertained beneficiaries, were represented by independent counsel or GALs, as appropriate, that several independent expert professionals were employed by certain *Page 46 
groups of beneficiaries, including the GALs, and that lengthy and complex settlement negotiations continued at arms-length over many years in an effort to resolve contested bona fide claims, this Court finds that the Settlement Agreement is fair and in the best interests of all of the beneficiaries of the Trust.
This Court approves the terms of the Settlement Agreement and the Addendum and authorizes termination of the Trust and distribution of the Trust assets pursuant to the terms of the Settlement Agreement and the Addendum, under the doctrine of consent as set forth in Section 65 of the Third Restatement. The Order to be entered herein shall be binding on all parties to the 2007 Settlement Agreement, the minor, unborn and unascertained beneficiaries of the Trust, and the Attorney General of the State of Rhode Island.
The Court further finds that under the circumstances incident to thismatter, it would be in the best interests of the trusts and of thebeneficiaries thereof for the endnotes to be sealed and opened only forgood cause shown and with the approval of the Court. Counsel for the Trustees is directed forthwith to prepare an Order consistent herewith incorporating this decision by reference which Order shall be settled on five days notice.
[1] [EDITORS' NOTE: FOOTNOTE 1 IS OMITTED FROM THE OFFICIAL COPY OF THIS DOCUMENT, THEREFORE IT IS NOT DISPLAYED IN THE ONLINE VERSION.]
[2] [EDITORS' NOTE: FOOTNOTE 2 IS OMITTED FROM THE OFFICIAL COPY OF THIS DOCUMENT, THEREFORE IT IS NOT DISPLAYED IN THE ONLINE VERSION.]
[3] [EDITORS' NOTE: FOOTNOTE 3 IS OMITTED FROM THE OFFICIAL COPY OF THIS DOCUMENT, THEREFORE IT IS NOT DISPLAYED IN THE ONLINE VERSION.]
[4] [EDITORS' NOTE: FOOTNOTE 4 IS OMITTED FROM THE OFFICIAL COPY OF THIS DOCUMENT, THEREFORE IT IS NOT DISPLAYED IN THE ONLINE VERSION.]
[5] [EDITORS' NOTE: FOOTNOTE 5 IS OMITTED FROM THE OFFICIAL COPY OF THIS DOCUMENT, THEREFORE IT IS NOT DISPLAYED IN THE ONLINE VERSION.]
[6] [EDITORS' NOTE: FOOTNOTE 6 IS OMITTED FROM THE OFFICIAL COPY OF THIS DOCUMENT, THEREFORE IT IS NOT DISPLAYED IN THE ONLINE VERSION.]
[7] [EDITORS' NOTE: FOOTNOTE 7 IS OMITTED FROM THE OFFICIAL COPY OF THIS DOCUMENT, THEREFORE IT IS NOT DISPLAYED IN THE ONLINE VERSION.]
[8] [EDITORS' NOTE: FOOTNOTE 8 IS OMITTED FROM THE OFFICIAL COPY OF THIS DOCUMENT, THEREFORE IT IS NOT DISPLAYED IN THE ONLINE VERSION.]
[9] [EDITORS' NOTE: FOOTNOTE 9 IS OMITTED FROM THE OFFICIAL COPY OF THIS DOCUMENT, THEREFORE IT IS NOT DISPLAYED IN THE ONLINE VERSION.]
[10] [EDITORS' NOTE: FOOTNOTE 10 IS OMITTED FROM THE OFFICIAL COPY OF THIS DOCUMENT, THEREFORE IT IS NOT DISPLAYED IN THE ONLINE VERSION.]
[11] [EDITORS' NOTE: FOOTNOTE 11 IS OMITTED FROM THE OFFICIAL COPY OF THIS DOCUMENT, THEREFORE IT IS NOT DISPLAYED IN THE ONLINE VERSION.]
[12] [EDITORS' NOTE: FOOTNOTE 12 IS OMITTED FROM THE OFFICIAL COPY OF THIS DOCUMENT, THEREFORE IT IS NOT DISPLAYED IN THE ONLINE VERSION.]
[13] [EDITORS' NOTE: FOOTNOTE 13 IS OMITTED FROM THE OFFICIAL COPY OF THIS DOCUMENT, THEREFORE IT IS NOT DISPLAYED IN THE ONLINE VERSION.]
[14] [EDITORS' NOTE: FOOTNOTE 14 IS OMITTED FROM THE OFFICIAL COPY OF THIS DOCUMENT, THEREFORE IT IS NOT DISPLAYED IN THE ONLINE VERSION.]
[15] [EDITORS' NOTE: FOOTNOTE 15 IS OMITTED FROM THE OFFICIAL COPY OF THIS DOCUMENT, THEREFORE IT IS NOT DISPLAYED IN THE ONLINE VERSION.]